## LOCHNER *v.* NEW YORK.

ERROR TO THE COUNTY COURT OF ONEIDA COUNTY, STATE OF
NEW YORK.

No. 292. Argued February 23, 24, 1905.—Decided April 17, 1905.

The general right to make a contract in relation to his business is part of
the liberty protected by the Fourteenth Amendment, and this includes
the right to purchase and sell labor, except as controlled by the State
in the legitimate exercise of its police power.

Liberty of contract relating to labor includes both parties to it; the one has
as much right to purchase as the other to sell labor.

There is no reasonable ground, on the score of health, for interfering with
the liberty of the person or the right of free contract, by determining the
hours of labor, in the occupation of a baker. Nor can a law limiting
such hours be justified as a health law to safeguard the public health, or
the health of the individuals following that occupation.

Section 110 of the labor law of the State of New York, providing that no
employés shall be required or permitted to work in bakeries more than
sixty hours in a week, or ten hours a day, is not a legitimate exercise of
the police power of the State, but an unreasonable, unnecessary and
arbitrary interference with the right and liberty of the individual to
contract, in relation to labor, and as such it is in conflict with, and void
under, the Federal Constitution.

THIS is a writ of error to the County Court of Oneida County,
in the State of New York (to which court the record had been
remitted), to review the judgment of the Court of Appeals of
that State, affirming the judgment of the Supreme Court, which
itself affirmed the judgment of the County Court, convicting
the defendant of a misdemeanor on an indictment under a
statute of that State, known, by its short title, as the labor

law. The section of the statute under which the indictment was found is section 110, and is reproduced in the margin,[1] (together with the other sections of the labor law upon the subject of bakeries, being sections 111 to 115, both inclusive).

The indictment averred that the defendant "wrongfully and unlawfully required and permitted an employé working for him in his biscuit, bread and cake bakery and confectionery establishment, at the city of Utica, in this county, to work more than sixty hours in one week," after having been theretofore convicted of a violation of the same act; and therefore, as averred, he committed the crime or misdemeanor, second offense. The plaintiff in error demurred to the indictment on several grounds, one of which was that the facts stated did not

---

[1] "§ 110. *Hours of labor in bakeries and confectionery establishments.*— No employé shall be required or permitted to work in a biscuit, bread or cake bakery or confectionery establishment more than sixty hours in any one week, or more than ten hours in any one day, unless for the purpose of making a shorter work day on the last day of the week; nor more hours in any one week than will make an average of ten hours per day for the number of days during such week in which such employé shall work.

"§ 111. *Drainage and plumbing of buildings and rooms occupied by bakeries.* —All buildings or rooms occupied as biscuit, bread, pie or cake bakeries, shall be drained and plumbed in a manner conducive to the proper and healthful sanitary condition thereof, and shall be constructed with air shafts, windows or ventilating pipes, sufficient to insure ventilation. The factory inspector may direct the proper drainage, plumbing and ventilation of such rooms or buildings. No cellar or basement, not now used for a bakery shall hereafter be so occupied or used, unless the proprietor shall comply with the sanitary provisions of this article.

"§ 112. *Requirements as to rooms, furniture, utensils and manufactured products.*—Every room used for the manufacture of flour or meal food products shall be at least eight feet in height and shall have, if deemed necessary by the factory inspector, an impermeable floor constructed of cement, or of tiles laid in cement, or an additional flooring of wood properly saturated with linseed oil. The side walls of such rooms shall be plastered or wainscoted. The factory inspector may require the side walls and ceiling to be whitewashed, at least once in three months. He may also require the wood work of such walls to be painted. The furniture and utensils shall be so arranged as to be readily cleansed and not prevent the proper cleaning of any part of a room. The manufactured flour or meal food products shall be kept in dry and airy rooms, so arranged that the floors, shelves and all

constitute a crime. The demurrer was overruled, and the plaintiff in error having refused to plead further, a plea of not guilty was entered by order of the court and the trial commenced, and he was convicted of misdemeanor, second offense, as indicted, and sentenced to pay a fine of $50 and to stand committed until paid, not to exceed fifty days in the Oneida County jail. A certificate of reasonable doubt was granted by the county judge of Oneida County, whereon an appeal was taken to the Appellate Division of the Supreme Court, Fourth Department, where the judgment of conviction was affirmed. 73 App. Div. N. Y. 120. A further appeal was then taken to the Court of Appeals, where the judgment of conviction was again affirmed. 177 N. Y. 145.

---

other facilities for storing the same can be properly cleaned. No domestic animals, except cats, shall be allowed to remain in a room used as a biscuit, bread, pie, or cake bakery, or any room in such bakery where flour or meal products are stored.

"§ 113. *Wash-rooms and closets; sleeping places.*—Every such bakery shall be provided with a proper wash-room and water-closet or water-closets apart from the bake-room, or rooms where the manufacture of such food product is conducted, and no water-closet, earth-closet, privy or ash-pit shall be within or connected directly with the bake-room of any bakery, hotel or public restaurant.

"No person shall sleep in a room occupied as a bake-room. Sleeping places for the persons employed in the bakery shall be separate from the rooms where flour or meal food products are manufactured or stored. If the sleeping places are on the same floor where such products are manufactured, stored or sold, the factory inspector may inspect and order them put in a proper sanitary condition.

"§ 114. *Inspection of bakeries.*—The factory inspector shall cause all bakeries to be inspected. If it be found upon such inspection that the bakeries so inspected are constructed and conducted in compliance with the provisions of this chapter, the factory inspector shall issue a certificate to the persons owning or conducting such bakeries.

"§ 115. *Notice requiring alterations.*—If, in the opinion of the factory inspector, alterations are required in or upon premises occupied and used as bakeries, in order to comply with the provisions of this article, a written notice shall be served by him upon the owner, agent or lessee of such premises, either personally or by mail, requiring such alterations to be made within sixty days after such service, and such alterations shall be made accordingly."

*Mr. Frank Harvey Field* and *Mr. Henry Weissmann* for plaintiff in error:

The statute in question denies to certain persons in the baking trade the equal protection of the laws.

The legislation must affect equally all persons engaged in the business of baking in order to conform to this provision of the Fourteenth Amendment. It really affects but a portion of the baking trade, namely, employés "in a biscuit, bread or cake bakery, or confectionery establishment." *Connolly v. Union Sewer Pipe Co.*, 184 U. S. 540; *Ex parte Westerfield,* 55 California, 550.

The Constitution itself says that no State shall "deny to any person within its jurisdiction the equal protection of the laws." It does not say, "no considerable number of persons," but "any person." And this plaintiff in error may appeal with confidence to the supreme law of the land against this law which singles out a certain number of men employing bakers, and permits all others similarly situated, including many who are competitors in business, to work their employés as long as they choose. *Freund's Police Power*, 633; *Missouri v. Lewis*, 101 U. S. 31; *Barbier v. Connolly*, 113 U. S. 27; *Colling v. Goddard*, 183 U. S. 79, 92; *Yick Wo v. Hopkins*, 118 U. S. 356; *Cooley's Const. Lim.* 282; *Tin Sing v. Washburn*, 20 California, 534.

Classification must be based upon some difference bearing a reasonable and just relation to the act in respect to which the classification is attempted, but no mere arbitrary selection can ever be justified by calling it classification. *Santa Fé R. R. Co. v. Matthews*, 174 U. S. 105. Class legislation of the character of the act in issue enacted by the States which discriminates in favor of one person or set of persons and against another or others is forbidden by the Fourteenth Amendment. *Gulf C. & S. F. R. Co. v. Ellis*, 165 U. S. 150; *Cotting v. Kansas City S. Y. Co.*, 183 U. S. 79; *Connolly v. U. S. P. Co.*, 184 U. S. 540; *People v. Orange County Road Co.*, 175 N. Y. 87, 90.

The equal protection of the laws is a pledge of the protection

of equal laws. *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369; *Gibbons* v. *Ogden*, 9 Wheat. 1, 210; *Sinnot* v. *Davenport*, 22 How. 227, 243; *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746; *M., K. & T. R. Co.* v. *Haber*, 169 U. S. 613, 626.

The statute in question is not a reasonable exercise of the police power either from the standpoint of the trade itself or from the standpoint of the decisions interpreting the exer-. cise of the police power in connection with the Fourteenth Amendment.

As to the trade there is no danger to the employé in a first-class bakery and so far as unsanitary conditions are concerned the employé is protected by other sections of the law. *Ex parte Westerfield*, 55 California, 550; 2 Buck's Hygiene and Public Health, 10; The Lancet, vol. 2, 1895, 298; Special Sanitary Report of The Lancet on Bakeries, 1889, p. 1140; and 1890, pp. 42, 208, 719; Reference Handbook of Medical Sciences, vol. 6, p. 317; The Practitioner, vol. 53, 1894, p. 387; Arlidge on Diseases of Occupations; Dragle in 45th Annual Report, Register General.

The law is not a proper exercise of the police power. 4 Black. 162; Jeremey Bentham, Edinburgh ed., part IX, 157; Cooley Const. Lim. 572; 2 Kent's Com. 340; *Slaughter House Case*, 16 Wall. 36; *Re Jacobs*, 98 N. Y. 98; Tiedemann Police Power, § 178; Freund Police Power, 534.

Where the ostensible object of an enactment is to secure the public comfort, welfare or safety, it must appear to be adapted to that end, it cannot invade the rights of persons and property under the guise of the police regulation, when it is not such in fact. *Eden* v. *People*, 161 Illinois, 296; *Ex parte Jentsch*, 112 California, 468; *Ritchie* v. *People*, 155 Illinois, 98; *Lake View* v. *Rose Hill Cemetery Co.*, 70 Illinois, 191; *People* v. *Marx*, 99 N. Y. 377, 387; *People* v. *Gillson*, 109 N. Y. 389, 399; *People* v. *Bresecker*, 169 N. Y. 53; *People* v. *Hawkins*, 157 N. Y. 1; *People* v. *Beattie*, 96 App. Div. N. Y. 383, 390, 399. For other decisions of the Court of Appeals, interpreting the labor law, see *People ex rel.* v. *Coler*, 166 N. Y. 1; *Ryan* v. *City*

*of New York,* 177 N. Y. 271; *People ex rel.* v. *Grout,* 179 N. Y. 417.

As to fundamental right to pursue occupations, see decisions of this court in cases cited *supra* and *Calder* v. *Bull,* 3 Dall. 386; *Munn* v. *Illinois,* 94 U. S. 79; *United States* v. *Martin,* 94 U. S. 400. And see *People* v. *Phyfe,* 136 N. Y. 554; *Henderson* v. *Mayor,* 92 U. S. 259.

In the other state courts legislation of the kind in issue has been almost uniformly declared invalid. *Sawyer* v. *Davis,* 136 Massachusetts, 239, 243; *Eden* v. *People,* 161 Illinois, 296; *Ritchie* v. *People,* 155 Illinois, 98; *Ex parte Kuback,* 85 California, 274; *Godcharles* v. *Wigeman,* 113 Pa. St. 431; *State* v. *Goodwill,* 33 W. Va. 179; *Leep* v. *St. Louis R. R. Co.,* 58 Arkansas, 407; *Low* v. *Rees Pub. Co.,* 41 Nebraska, 127.

The statute in question was never intended as a health provision but was purely a labor law. This is indicated by the facts leading up to the adoption of this statute by the New York legislature. For acts of this nature generally, see English Bakehouse Acts of 1863, 26, 27 Vict., ch. 40; English Factory Act of 1883; Baker's Journal, New York City, May 8, 1895; Report New York State Bureau Labor Statistics, 1892, vol. 3; Ch. 548, New York Laws of 1895; Ch. 672, 1896; Ch. 415, § 5, Laws of 1897; New Jersey act of April, 1896; Bakeshop Act of Ontario, April 7, 1896; Acts of Maryland, and Massachusetts, passed in 1897.

*Mr. Julius M. Mayer,* Attorney General of the State of New York, for defendant in error:

The New York statute under consideration involves an exercise of the police power of the State. The burden of demonstrating that this statute is repugnant to the provisions of the Federal Constitution is upon the plaintiff in error, and he must show that there was no basis upon which the state court could rest its conclusion that the legislation in question was a proper exercise of police power. *Holden* v. *Hardy,* 169 U. S. 366.

The conditions existing in the State of New York, which may be considered as the occasion for the enactment of the statute under consideration, show that it was a proper exercise of the police power of the State.

The power of the legislature to decide what laws are necessary to secure the public health, safety or welfare is subject to the power of the court to decide whether an act purporting to promote the public health or safety has such a reasonable connection therewith as to appear upon inspection to be adapted to that end. And the court may take judicial notice of the fact of the common belief of the people upon that subject. *Matter of Viemeister,* 179 N. Y. 235.

There are two views as to the words in the statute—"no employé shall be required or *permitted to work.*" The statute was carefully drafted so as to prevent evasion. It was intended to be a barrier to the employer who might testify that he had not orally or in writing *required* his employé to work, and yet he might by inference and acquiescence accomplish the same result by "permitting" him to so work.

The State, in undertaking this regulation, has a right to safeguard the citizen against his own lack of knowledge. In dealing with certain classes of men the State may properly say that, for the purpose of having able-bodied men at its command when it desires, it shall not permit these men, when engaged in dangerous or unhealthful occupations, to work for a longer period of time each day than is found to be in the interest of the health of the person upon whom the legislation acts.

The unhealthful character of the baker's occupation was fully commented upon by Judge Vann in his opinion in the Court of Appeals. The opinions of the judges of that court are very exhaustive and refer fully to all the cases on this subject.

The propriety of its exercise within constitutional limits is purely a matter of legislative discretion with which courts cannot interfere. *People* v. *King,* 110 N. Y. 418, 423.

If the act "admits of two constructions as to its being a

health measure or otherwise, the courts should give the construction which sustains the act and makes it applicable in furtherance of the public interests. *Bohmer* v. *Haffen*, 161 N. Y. 390, 399.

MR. JUSTICE PECKHAM, after making the foregoing statement of the facts, delivered the opinion of the court.

The indictment, it will be seen, charges that the plaintiff in error violated the one hundred and tenth section of article 8, chapter 415, of the Laws of 1897, known as the labor law of the State of New York, in that he wrongfully and unlawfully required and permitted an employé working for him to work more than sixty hours in one week. There is nothing in any of the opinions delivered in this case, either in the Supreme Court or the Court of Appeals of the State, which construes the section, in using the word "required," as referring to any physical force being used to obtain the labor of an employé. It is assumed that the word means nothing more than the requirement arising from voluntary contract for such labor in excess of the number of hours specified in the statute. There is no pretense in any of the opinions that the statute was intended to meet a case of involuntary labor in any form. All the opinions assume that there is no real distinction, so far as this question is concerned, between the words "required" and "permitted." The mandate of the statute that "no employé shall be required or permitted to work," is the substantial equivalent of an enactment that "no employé shall contract or agree to work," more than ten hours per day, and as there is no provision for special emergencies the statute is mandatory in all cases. It is not an act merely fixing the number of hours which shall constitute a legal day's work, but an absolute prohibition upon the employer, permitting, under any circumstances, more than ten hours work to be done in his establishment. The employé may desire to earn the extra money, which would arise from his working more than the prescribed

time, but this statute forbids the employer from permitting the employé to earn it.

The statute necessarily interferes with the right of contract between the employer and employés, concerning the number of hours in which the latter may labor in the bakery of the employer. The general right to make a contract in relation to his business is part of the liberty of the individual protected by the Fourteenth Amendment of the Federal Constitution. *Allgeyer* v. *Louisiana,* 165 U. S. 578. Under that provision no State can deprive any person of life, liberty or property without due process of law. The right to purchase or to sell labor is part of the liberty protected by this amendment, unless there are circumstances which exclude the right. There are, however, certain powers, existing in the sovereignty of each State in the Union, somewhat vaguely termed police powers, the exact description and limitation of which have not been attempted by the courts. Those powers, broadly stated and without, at present, any attempt at a more specific limitation, relate to the safety, health, morals and general welfare of the public. Both property and liberty are held on such reasonable conditions as may be imposed by the governing power of the State in the exercise of those powers, and with such conditions the Fourteenth Amendment was not designed to interfere. *Mugler* v. *Kansas,* 123 U. S. 623; *In re Kemmler,* 136 U. S. 436; *Crowley* v. *Christensen.* 137 U. S. 86; *In re Converse,* 137 U. S. 624.

The State, therefore, has power to prevent the individual from making certain kinds of contracts, and in regard to them the Federal Constitution offers no protection. If the contract be one which the State, in the legitimate exercise of its police power, has the right to prohibit, it is not prevented from prohibiting it by the Fourteenth Amendment. Contracts in violation of a statute, either of the Federal or state government, or a contract to let one's property for immoral purposes, or to do any other unlawful act, could obtain no protection from the Federal Constitution, as coming under the liberty of

person or of free contract. Therefore, when the State, by its legislature, in the assumed exercise of its police powers, has passed an act which seriously limits the right to labor or the right of contract in regard to their means of livelihood between persons who are *sui juris* (both employer and employé), it becomes of great importance to determine which shall prevail—the right of the individual to labor for such time as he may choose, or the right of the State to prevent the individual from laboring or from entering into any contract to labor, beyond a certain time prescribed by the State.

This court has recognized the existence and upheld the exercise of the police powers of the States in many cases which might fairly be considered as border ones, and it has, in the course of its determination of questions regarding the asserted invalidity of such statutes, on the ground of their violation of the rights secured by the Federal Constitution, been guided by rules of a very liberal nature, the application of which has resulted, in numerous instances, in upholding the validity of state statutes thus assailed. Among the later cases where the state law has been upheld by this court is that of *Holden* v. *Hardy*, 169 U. S. 366. A provision in the act of the legislature of Utah was there under consideration, the act limiting the employment of workmen in all underground mines or workings, to eight hours per day, "except in cases of emergency, where life or property is in imminent danger." It also limited the hours of labor in smelting and other institutions for the reduction or refining of ores or metals to eight hours per day, except in like cases of emergency. The act was held to be a valid exercise of the police powers of the State. A review of many of the cases on the subject, decided by this and other courts, is given in the opinion. It was held that the kind of employment, mining, smelting, etc., and the character of the employés in such kinds of labor, were such as to make it reasonable and proper for the State to interfere to prevent the employés from being constrained by the rules laid down by the proprietors in regard to labor. The following citation

from the observations of the Supreme Court of Utah in that case was made by the judge writing the opinion of this court, and approved: "The law in question is confined to the protection of that class of people engaged in labor in underground mines, and in smelters and other works wherein ores are reduced and refined. This law applies only to the classes subjected by their employment to the peculiar conditions and effects attending underground mining and work in smelters, and other works for the reduction and refining of ores. Therefore it is not necessary to discuss or decide whether the legislature can fix the hours of labor in other employments."

It will be observed that, even with regard to that class of labor, the Utah statute provided for cases of emergency wherein the provisions of the statute would not apply. The statute now before this court has no emergency clause in it, and, if the statute is valid, there are no circumstances and no emergencies under which the slightest violation of the provisions of the act would be innocent. There is nothing in *Holden* v. *Hardy* which covers the case now before us. Nor does *Atkin* v. *Kansas*, 191 U. S. 207, touch the case at bar. The *Atkin case* was decided upon the right of the State to control its municipal corporations and to prescribe the conditions upon which it will permit work of a public character to be done for a municipality. *Knoxville Iron Co. v. Harbison*, 183 U. S. 13, is equally far from an authority for this legislation. The employés in that case were held to be at a disadvantage with the employer in matters of wages, they being miners and coal workers, and the act simply provided for the cashing of coal orders when presented by the miner to the employer.

The latest case decided by this court, involving the police power, is that of *Jacobson* v. *Massachusetts*, decided at this term and reported in 197 U. S. 11. It related to compulsory vaccination, and the law was held valid as a proper exercise of the police powers with reference to the public health. It was stated in the opinion that it was a case "of an adult who, for aught that appears, was himself in perfect health and a fit

subject for vaccination, and yet, while remaining in the community, refused to obey the statute and the regulation adopted in execution of its provisions for the protection of the public health and the public safety, confessedly endangered by the presence of a dangerous disease." That case is also far from covering the one now before the court.

*Petit* v. *Minnesota*, 177 U. S. 164, was upheld as a proper exercise of the police power relating to the observance of Sunday, and the case held that the legislature had the right to declare that, as matter of law, keeping barber shops open on Sunday was not a work of necessity or charity.

It must, of course, be conceded that there is a limit to the valid exercise of the police power by the State. There is no dispute concerning this general proposition. Otherwise the Fourteenth Amendment would have no efficacy and the legislatures of the States would have unbounded power, and it would be enough to say that any piece of legislation was enacted to conserve the morals, the health or the safety of the people; such legislation would be valid, no matter how absolutely without foundation the claim might be. The claim of the police power would be a mere pretext—become another and delusive name for the supreme sovereignty of the State to be exercised free from constitutional restraint. This is not contended for. In every case that comes before this court, therefore, where legislation of this character is concerned and where the protection of the Federal Constitution is sought, the question necessarily arises: Is this a fair, reasonable and appropriate exercise of the police power of the State, or is it an unreasonable, unnecessary and arbitrary interference with the right of the individual to his personal liberty or to enter into those contracts in relation to labor which may seem to him appropriate or necessary for the support of himself and his family? Of course the liberty of contract relating to labor includes both parties to it. The one has as much right to purchase as the other to sell labor.

This is not a question of substituting the judgment of the

court for that of the legislature. If the act be within the power of the State it is valid, although the judgment of the court might be totally opposed to the enactment of such a law. But the question would still remain: Is it within the police power of the State? and that question must be answered by the court.

The question whether this act is valid as a labor law, pure and simple, may be dismissed in a few words. There is no reasonable ground for interfering with the liberty of person or the right of free contract, by determining the hours of labor, in the occupation of a baker. There is no contention that bakers as a class are not equal in intelligence and capacity to men in other trades or manual occupations, or that they are not able to assert their rights and care for themselves without the protecting arm of the State, interfering with their independence of judgment and of action. They are in no sense wards of the State. Viewed in the light of a purely labor law, with no reference whatever to the question of health, we think that a law like the one before us involves neither the safety, the morals nor the welfare of the public, and that the interest of the public is not in the slightest degree affected by such an act. The law must be upheld, if at all, as a law pertaining to the health of the individual engaged in the occupation of a baker. It does not affect any other portion of the public than those who are engaged in that occupation. Clean and wholesome bread does not depend upon whether the baker works but ten hours per day or only sixty hours a week. The limitation of the hours of labor does not come within the police power on that ground.

It is a question of which of two powers or rights shall prevail —the power of the State to legislate or the right of the individual to liberty of person and freedom of contract. The mere assertion that the subject relates though but in a remote degree to the public health does not necessarily render the enactment valid. The act must have a more direct relation, as a means to an end, and the end itself must be appropriate and legitimate, before an act can be held to be valid which interferes

with the general right of an individual to be free in his person
and in his power to contract in relation to his own labor.

This case has caused much diversity of opinion in the state
courts. In the Supreme Court two of the five judges compos-
ing the Appellate Division dissented from the judgment affirm-
ing the validity of the act. In the Court of Appeals three of
the seven judges also dissented from the judgment upholding
the statute. Although found in what is called a labor law of
the State, the Court of Appeals has upheld the act as one re-
lating to the public health—in other words, as a health law.
One of the judges of the Court of Appeals, in upholding the
law, stated that, in his opinion, the regulation in question could
not be sustained unless they were able to say, from common
knowledge, that working in a bakery and candy factory was
an unhealthy employment. The judge held that, while the
evidence was not uniform, it still led him to the conclusion that
the occupation of a baker or confectioner was unhealthy and
tended to result in diseases of the respiratory organs. Three
of the judges dissented from that view, and they thought the
occupation of a baker was not to such an extent unhealthy as
to warrant the interference of the legislature with the liberty
of the individual.

We think the limit of the police power has been reached and
passed in this case. There is, in our judgment, no reasonable
foundation for holding this to be necessary or appropriate as
a health law to safeguard the public health or the health of the
individuals who are following the trade of a baker. If this
statute be valid, and if, therefore, a proper case is made out in
which to deny the right of an individual, *sui juris*, as em-
ployer or employé, to make contracts for the labor of the
latter under the protection of the provisions of the Federal
Constitution, there would seem to be no length to which legis-
lation of this nature might not go. The case differs widely,
as we have already stated, from the expressions of this court
in regard to laws of this nature, as stated in *Holden* v. *Hardy*
and *Jacobson* v. *Massachusetts, supra.*

We think that there can be no fair doubt that the trade of a baker, in and of itself, is not an unhealthy one to that degree which would authorize the legislature to interfere with the right to labor, and with the right of free contract on the part of the individual, either as employer or employé.   In looking through statistics regarding all trades and occupations, it may be true that the trade of a baker does not appear to be as healthy as some other trades, and is also vastly more healthy than still others.   To the common understanding the trade of a baker has never been regarded as an unhealthy one.   Very likely physicians would not recommend the exercise of that or of any other trade as a remedy for ill health.   Some occupations are more healthy than others, but we think there are none which might not come under the power of the legislature to supervise and control the hours of working therein, if the mere fact that the occupation is not absolutely and perfectly healthy is to confer that right upon the legislative department of the Government.   It might be safely affirmed that almost all occupations more or less affect the health.   There must be more than the mere fact of the possible existence of some small amount of unhealthiness to warrant legislative interference with liberty. It is unfortunately true that labor, even in any department, may possibly carry with it the seeds of unhealthiness.   But are we all, on that account, at the mercy of legislative majorities?   A printer, a tinsmith, a locksmith, a carpenter, a cabinetmaker, a dry goods clerk, a bank's, a lawyer's or a physician's clerk, or a clerk in almost any kind of business, would all come under the power of the legislature, on this assumption.   No trade, no occupation, no mode of earning one's living, could escape this all-pervading power, and the acts of the legislature in limiting the hours of labor in all employments would be valid, although such limitation might seriously cripple the ability of the laborer to support himself and his family.   In our large cities there are many buildings into which the sun penetrates for but a short time in each day, and these buildings are occupied by people carrying on the

business of bankers, brokers, lawyers, real estate, and many other kinds of business, aided by many clerks, messengers, and other employés. Upon the assumption of the validity of this act under review, it is not possible to say that an act, prohibiting lawyers' or bank clerks, or others, from contracting to labor for their employers more than eight hours a day, would be invalid. It might be said that it is unhealthy to work more than that number of hours in an apartment lighted by artificial light during the working hours of the day; that the occupation of the bank clerk, the lawyer's clerk, the real estate clerk, or the broker's clerk in such offices is therefore unhealthy, and the legislature in its paternal wisdom must, therefore, have the right to legislate on the subject of and to limit the hours for such labor, and if it exercises that power and its validity be questioned, it is sufficient to say, it has reference to the public health; it has reference to the health of the employés condemned to labor day after day in buildings where the sun never shines; it is a health law, and therefore it is valid, and cannot be questioned by the courts.

It is also urged, pursuing the same line of argument, that it is to the interest of the State that its population should be strong and robust, and therefore any legislation which may be said to tend to make people healthy must be valid as health laws, enacted under the police power. If this be a valid argument and a justification for this kind of legislation, it follows that the protection of the Federal Constitution from undue interference with liberty of person and freedom of contract is visionary, wherever the law is sought to be justified as a valid exercise of the police power. Scarcely any law but might find shelter under such assumptions, and conduct, properly so called, as well as contract, would come under the restrictive sway of the legislature. Not only the hours of employés, but the hours of employers, could be regulated, and doctors, lawyers, scientists, all professional men, as well as athletes and artisans, could be forbidden to fatigue their brains and bodies by prolonged hours of exercise, lest the fighting strength

of the State be impaired. We mention these extreme cases because the contention is extreme. We do not believe in the soundness of the views which uphold this law. On the contrary, we think that such a law as this, although passed in the assumed exercise of the police power, and as relating to the public health, or the health of the employés named, is not within that power, and is invalid. The act is not, within any fair meaning of the term, a health law, but is an illegal interference with the rights of individuals, both employers and employés, to make contracts regarding labor upon such terms as they may think best, or which they may agree upon with the other parties to such contracts. Statutes of the nature of that under review, limiting the hours in which grown and intelligent men may labor to earn their living, are mere meddlesome interferences with the rights of the individual, and they are not saved from condemnation by the claim that they are passed in the exercise of the police power and upon the subject of the health of the individual whose rights are interfered with, unless there be some fair ground, reasonable in and of itself, to say that there is material danger to the public health or to the health of the employés, if the hours of labor are not curtailed. If this be not clearly the case the individuals, whose rights are thus made the subject of legislative interference, are under the protection of the Federal Constitution regarding their liberty of contract as well as of person; and the legislature of the State has no power to limit their right as proposed in this statute. All that it could properly do has been done by it with regard to the conduct of bakeries, as provided for in the other sections of the act, above set forth. These several sections provide for the inspection of the premises where the bakery is carried on, with regard to furnishing proper wash-rooms and water-closets, apart from the bakeroom, also with regard to providing proper drainage, plumbing and painting; the sections, in addition, provide for the height of the ceiling, the cementing or tiling of floors, where necessary in the opinion of the factory inspector, and for other things of

that nature; alterations are also provided for and are to be made where necessary in the opinion of the inspector, in order to comply with the provisions of the statute.   These various sections may be wise and valid regulations, and they certainly go to the full extent of providing for the cleanliness and the healthiness, so far as possible, of the quarters in which bakeries are to be conducted.   Adding to all these requirements, a prohibition to enter into any contract of labor in a bakery for more than a certain number of hours a week, is, in our judgment, so wholly beside the matter of a proper, reasonable and fair provision, as to run counter to that liberty of person and of free contract provided for in the Federal Constitution.

It was further urged on the argument that restricting the hours of labor in the case of bakers was valid because it tended to cleanliness on the part of the workers, as a man was more apt to be cleanly when not overworked, and if cleanly then his "output" was also more likely to be so.   What has already been said applies with equal force to this contention.   We do not admit the reasoning to be sufficient to justify the claimed right of such interference.   The State in that case would assume the position of a supervisor, or *pater familias*, over every act of the individual, and its right of governmental interference with his hours of labor, his hours of exercise, the character thereof, and the extent to which it shall be carried would be recognized and upheld.   In our judgment it is not possible in fact to discover the connection between the number of hours a baker may work in the bakery and the healthful quality of the bread made by the workman.   The connection, if any exists, is too shadowy and thin to build any argument for the interference of the legislature.   If the man works ten hours a day it is all right, but if ten and a half or eleven his health is in danger and his bread may be unhealthful, and, therefore, he shall not be permitted to do it.   This, we think, is unreasonable and entirely arbitrary.   When assertions such as we have adverted to become necessary in order to give, if possible, a plausible foundation for the contention that the law is a "health law,"

it gives rise to at least a suspicion that there was some other motive dominating the legislature than the purpose to subserve the public health or welfare.

This interference on the part of the legislatures of the several States with the ordinary trades and occupations of the people seems to be on the increase. In the Supreme Court of New York, in the case of *People* v. *Beattie*, Appellate Division, First Department, decided in 1904, 89 N. Y. Supp. 193, a statute regulating the trade of horseshoeing, and requiring the person practicing such trade to be examined and to obtain a certificate from a board of examiners and file the same with the clerk of the county wherein the person proposes to practice such trade, was held invalid, as an arbitrary interference with personal liberty and private property without due process of law. The attempt was made, unsuccessfully, to justify it as a health law.

The same kind of a statute was held invalid (*In re Aubry*) by the Supreme Court of Washington in December, 1904. 78 Pac. Rep. 900. The court held that the act deprived citizens of their liberty and property without due process of law and denied to them the equal protection of the laws. It also held that the trade of a horseshoer is not a subject of regulation under the police power of the State, as a business concerning and directly affecting the health, welfare or comfort of its inhabitants; and that therefore a law which provided for the examination and registration of horseshoers in certain cities was unconstitutional, as an illegitimate exercise of the police power.

The Supreme Court of Illinois in *Bessette* v. *People*, 193 Illinois, 334, also held that a law of the same nature, providing for the regulation and licensing of horseshoers, was unconstitutional as an illegal interference with the liberty of the individual in adopting and pursuing such calling as he may choose, subject only to the restraint necessary to secure the common welfare. See also *Godcharles* v. *Wigeman*, 113 Pa. St. 431, 437; *Low* v. *Rees Printing Co.*, 41 Nebraska, 127, 145. In

these cases the courts upheld the right of free contract and the right to purchase and sell labor upon such terms as the parties may agree to.

It is impossible for us to shut our eyes to the fact that many of the laws of this character, while passed under what is claimed to be the police power for the purpose of protecting the public health or welfare, are, in reality, passed from other motives. We are justified in saying so when, from the character of the law and the subject upon which it legislates, it is apparent that the public health or welfare bears but the most remote relation to the law. The purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is or is not repugnant to the Constitution of the United States must be determined from the natural effect of such statutes when put into operation, and not from their proclaimed purpose. *Minnesota* v. *Barber*, 136 U. S. 313; *Brimmer* v. *Rebman*, 138 U. S. 78. The court looks beyond the mere letter of the law in such cases. *Yick Wo* v. *Hopkins*, 118 U. S. 356.

It is manifest to us that the limitation of the hours of labor as provided for in this section of the statute under which the indictment was found, and the plaintiff in error convicted, has no such direct relation to and no such substantial effect upon the health of the employé, as to justify us in regarding the section as really a health law. It seems to us that the real object and purpose were simply to regulate the hours of labor between the master and his employés (all being men, *sui juris*), in a private business, not dangerous in any degree to morals or in any real and substantial degree, to the health of the employés. Under such circumstances the freedom of master and employé to contract with each other in relation to their employment, and in defining the same, cannot be prohibited or interfered with, without violating the Federal Constitution.

The judgment of the Court of Appeals of New York as well as that of the Supreme Court and of the County Court of Oneida County must be reversed and the case remanded to

the County Court for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE HARLAN, with whom MR. JUSTICE WHITE and MR. JUSTICE DAY concurred, dissenting.

While this court has not attempted to mark the precise boundaries of what is called the police power of the State, the existence of the power has been uniformly recognized, both by the Federal and state courts.

All the cases agree that this power extends at least to the protection of the lives, the health and the safety of the public against the injurious exercise by any citizen of his own rights.

In *Patterson* v. *Kentucky*, 97 U. S. 501, after referring to the general principle that rights given by the Constitution cannot be impaired by state legislation of any kind, this court said: "It [this court] has, nevertheless, with marked distinctness and uniformity, recognized the necessity, growing out of the fundamental conditions of civil society, of upholding state police regulations which were enacted in good faith, and had appropriate and direct connection with that protection to life, health, and property which each State owes to her citizens." So in *Barbier* v. *Connolly*, 113 U. S. 27: "But neither the [14th] Amendment—broad and comprehensive as it is— nor any other Amendment was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people."

Speaking generally, the State in the exercise of its powers may not unduly interfere with the right of the citizen to enter into contracts that may be necessary and essential in the enjoyment of the inherent rights belonging to every one, among which rights is the right "to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation." This was de-

clared in *Allgeyer* v. *Louisiana,* 165 U. S. 578, 589. But in the same case it was conceded that the right to contract in relation to persons and property or to do business, within a State, may be "regulated and sometimes prohibited, when the contracts or business conflict with the policy of the State as contained in its statutes" (p. 591).

So, as said in *Holden* v. *Hardy,* 169 U. S. 366, 391: "This right of contract, however, is itself subject to certain limitations which the State may lawfully impose in the exercise of its police powers. While this power is inherent in all governments, it has doubtless been greatly expanded in its application during the past century, owing to an enormous increase in the number of occupations which are dangerous, or so far detrimental to the health of the employés as to demand special precautions for their well-being and protection, or the safety of adjacent property. While this court has held, notably in the cases of *Davidson* v. *New Orleans,* 96 U. S. 97, and *Yick Wo* v. *Hopkins,* 118 U. S. 356, that the police power cannot be put forward as an excuse for oppressive and unjust legislation, it may be lawfully resorted to for the purpose of preserving the public health, safety or morals, or the abatement of public nuisances, and a large discretion 'is necessarily vested in the legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests.' *Lawton* v. *Steele,* 152 U. S. 133, 136." Referring to the limitations placed by the State upon the hours of workmen, the court in the same case said (p. 395): "These employments, when too long pursued, the legislature has judged to be detrimental to the health of the employés, and, so long as there are reasonable grounds for believing that this is so, its decision upon this subject cannot be reviewed by the Federal courts."

Subsequently in *Gundling* v. *Chicago,* 177 U. S. 183, 188, this court said: "Regulations respecting the pursuit of a lawful trade or business are of very frequent occurrence in the various cities of the country, and what such regulations shall be and

to what particular trade, business or occupation they shall apply, are questions for the State to determine, and their determination comes within the proper exercise of the police power by the State, and unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of the citizen are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not extend beyond the power of the State to pass, and they form no subject for Federal interference.

"As stated in *Crowley* v. *Christensen,* 137 U. S. 86, 'the possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order and morals of the community.'"

In *St. Louis, Iron Mountain &c. Ry.* v. *Paul,* 173 U. S. 404, 409, and in *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13, 21, 22, it was distinctly adjudged that the right of contract was not "absolute in respect to every matter, but may be subjected to the restraints demanded by the safety and welfare of the State." Those cases illustrate the extent to which the State may restrict or interfere with the exercise of the right of contracting.

The authorities on the same line are so numerous that further citations are unnecessary.

I take it to be firmly established that what is called the liberty of contract may, within certain limits, be subjected to regulations designed and calculated to promote the general welfare or to guard the public health, the public morals or the public safety. "The liberty secured by the Constitution of the United States to every person within its jurisdiction does not import," this court has recently said, "an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good." *Jacobson* v. *Massachusetts,* 197 U. S. 11.

Granting then that there is a liberty of contract which cannot be violated even under the sanction of direct legislative enactment, but assuming, as according to settled law we may assume, that such liberty of contract is subject to such regulations as the State may reasonably prescribe for the common good and the well-being of society, what are the conditions under which the judiciary may declare such regulations to be in excess of legislative authority and void? Upon this point there is no room for dispute; for, the rule is universal that a legislative enactment, Federal or state, is never to be disregarded or held invalid unless it be, beyond question, plainly and palpably in excess of legislative power. In *Jacobson* v. *Massachusetts, supra,* we said that the power of the courts to review legislative action in respect of a matter affecting the general welfare exists *only* "when that which the legislature has done comes within the rule that if a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law"—citing *Mugler* v. *Kansas*, 123 U. S. 623, 661; *Minnesota* v. *Barber*, 136 U. S. 313, 320: *Atkin* v. *Kansas*, 191 U. S. 207, 223. If there be doubt as to the validity of the statute, that doubt must therefore be resolved in favor of its validity, and the courts must keep their hands off, leaving the legislature to meet the responsibility for unwise legislation. If the end which the legislature seeks to accomplish be one to which its power extends, and if the means employed to that end, although not the wisest or best, are yet not plainly and palpably unauthorized by law, then the court cannot interfere. In other words, when the validity of a statute is questioned, the burden of proof, so to speak, is upon those who assert it to be unconstitutional. *McCulloch* v. *Maryland*, 4 Wheat. 316, 421.

Let these principles be applied to the present case. By the statute in question it is provided that, "No employé shall be required or permitted to work in a biscuit, bread or cake

bakery or confectionery establishment more than sixty hours in any one week, or more than ten hours in any one day, unless for the purpose of making a shorter work day on the last day of the week; nor more hours in any one week than will make an average of ten hours per day for the number of days during such week in which such employé shall work."

It is plain that this statute was enacted in order to protect the physical well-being of those who work in bakery and confectionery establishments. It may be that the statute had its origin, in part, in the belief that employers and employés in such establishments were not upon an equal footing, and that the necessities of the latter often compelled them to submit to such exactions as unduly taxed their strength. Be this as it may, the statute must be taken as expressing the belief of the people of New York that, as a general rule, and in the case of the average man, labor in excess of sixty hours during a week in such establishments may endanger the health of those who thus labor. Whether or not this be wise legislation it is not the province of the court to inquire. Under our systems of government the courts are not concerned with the wisdom or policy of legislation. So that in determining the question of power to interfere with liberty of contract, the court may inquire whether the means devised by the State are germane to an end which may be lawfully accomplished and have a real or substantial relation to the protection of health, as involved in the daily work of the persons, male and female, engaged in bakery and confectionery establishments. But when this inquiry is entered upon I find it impossible, in view of common experience, to say that there is here no real or substantial relation between the means employed by the State and the end sought to be accomplished by its legislation. *Mugler* v. *Kansas, supra.* Nor can I say that the statute has no appropriate or direct connection with that protection to health which each State owes to her citizens, *Patterson* v. *Kentucky, supra;* or that it is not promotive of the health of the employés in question, *Holden* v. *Hardy, Lawton* v. *Steele,*

*supra;* or that the regulation prescribed by the State is utterly
unreasonable and extravagant or wholly arbitrary, *Gundling*
v. *Chicago, supra.* Still less can I say that the statute is,
beyond question, a plain, palpable invasion of rights secured
by the fundamental law. *Jacobson* v. *Massachusetts, supra.*
Therefore I submit that this court will transcend its functions
if it assumes to annul the statute of New York. It must be
remembered· that·this statute does not apply to all kinds of
business. It applies only to work in bakery and confectionery
establishments, in which, as all know, the air constantly
breathed by workmen is not as pure and healthful as that to
be found in some other establishments or out of doors.

   Professor Hirt in his treatise on the "Diseases of the Work-
ers" has said: "The labor of the bakers is among the hardest
and most laborious imaginable, because it has to be performed
under conditions injurious to the health of those engaged in
it. It is hard, very hard work, not only. because it requires a
great deal of physical exertion in an overheated workshop and
during unreasonably long hours, but more so because of the
erratic demands of the public, compelling the baker to perform
the greater part of his work at night, thus depriving him of an
opportunity to enjoy the necessary rest and sleep, a fact which
is highly injurious to his health." Another writer says: "The
constant inhaling of flour dust causes inflammation of the
lungs and of the bronchial tubes. The eyes also suffer through
this dust, which is responsible for the many cases of running
eyes among the bakers. The long hours of toil to which all
bakers are subjected produce rheumatism, cramps and swollen
legs. The intense heat in the workshops induces the workers
to resort to cooling drinks, which together with their habit of
exposing the greater part of their bodies to the change in the
atmosphere, is another source of a number of diseases of various
organs. Nearly all bakers are pale-faced and of more delicate
health than the workers of other crafts, which is chiefly due
to their hard work and their irregular and unnatural mode of
living, whereby the power of resistance against disease is

greatly diminished. The average age of a baker is below that of other workmen; they seldom live over their fiftieth year, most of them dying between the ages of forty and fifty. During periods of epidemic diseases the bakers are generally the first to succumb to the disease, and the number swept away during such periods far exceeds the number of other crafts in comparison to the men employed in the respective industries. When, in 1720, the plague visited the city of Marseilles, France, every baker in the city succumbed to the epidemic, which caused considerable excitement in the neighboring cities and resulted in measures for the sanitary protection of the bakers."

In the Eighteenth Annual Report by the New York Bureau of Statistics of Labor it is stated that among the occupations involving exposure to conditions that interfere with nutrition is that of a baker (p. 52). In that Report it is also stated that "from a social point of view, production will be increased by any change in industrial organization which diminishes the number of idlers, paupers and criminals. Shorter hours of work, by allowing higher standards of comfort and purer family life, promise to enhance the industrial efficiency of the wage-working class—improved health, longer life, more content and greater intelligence and inventiveness" (p. 82).

Statistics show that the average daily working time among workingmen in different countries is, in Australia, 8 hours; in Great Britain, 9; in the United States, $9\frac{3}{4}$; in Denmark, $9\frac{3}{4}$; in Norway, 10; Sweden, France and Switzerland, $10\frac{1}{2}$; Germany, $10\frac{1}{4}$; Belgium, Italy and Austria, 11; and in Russia, 12 hours.

We judicially know that the question of the number of hours during which a workman should continuously labor has been, for a long period, and is yet, a subject of serious consideration among civilized peoples, and by those having special knowledge of the laws of health. Suppose the statute prohibited labor in bakery and confectionery establishments in excess of eighteen hours each day. No one, I take it, could dispute the power of the State to enact such a statute. But the statute

before us does not embrace extreme or exceptional cases.   It may be said to occupy a middle ground in respect of the hours of labor.   What is the true ground for the State to take between legitimate protection, by legislation, of the public health and liberty of contract is not a question easily solved, nor one in respect of which there is or can be absolute certainty.   There are very few, if any, questions in political economy about which entire certainty may be predicated.   One writer on relation of the State to labor has well said: "The manner, occasion, and degree in which the State may interfere with the industrial freedom of its citizens is one of the most debatable and difficult questions of social science."   Jevons, 33.

We also judicially know that the number of hours that should constitute a day's labor in particular occupations involving the physical strength and safety of workmen has been the subject of enactments by Congress and by nearly all of the States.   Many, if not most, of those enactments fix eight hours as the proper basis of a day's labor.

I do not stop to consider whether any particular view of this economic question presents the sounder theory.   What the precise facts are it may be difficult to say.   It is enough for the determination of this case, and it is enough for this court to know, that the question is one about which there is room for debate and for an honest difference of opinion.   There are many reasons of a weighty, substantial character, based upon the experience of mankind, in support of the theory that, all things considered, more than ten hours' steady work each day, from week to week, in a bakery or confectionery establishment, may endanger the health, and shorten the lives of the workmen, thereby diminishing their physical and mental capacity to serve the State, and to provide for those dependent upon them.

If such reasons exist that ought to be the end of this case, for the State is not amenable to the judiciary, in respect of its legislative enactments, unless such enactments are plainly, palpably, beyond all question, inconsistent with the Constitu-

tion of the United States. We are not to presume that the State of New York has acted in bad faith. Nor can we assume that its legislature acted without due deliberation, or that it did not determine this question upon the fullest attainable information, and for the common good. We cannot say that the State has acted without reason nor ought we to proceed upon the theory that its action is a mere sham. Our duty, I submit, is to sustain the statute as not being in conflict with the Federal Constitution, for the reason—and such is an all-sufficient reason—it is not shown to be plainly and palpably inconsistent with that instrument. Let the State alone in the management of its purely domestic affairs, so long as it does not appear beyond all question that it has violated the Federal Constitution. This view necessarily results from the principle that the health and safety of the people of a State are primarily for the State to guard and protect.

I take leave to say that the New York statute, in the particulars here involved, cannot be held to be in conflict with the Fourteenth Amendment, without enlarging the scope of the Amendment far beyond its original purpose and without bringing under the supervision of this court matters which have been supposed to belong exclusively to the legislative departments of the several States when exerting their conceded power to guard the health and safety of their citizens by such regulations as they in their wisdom deem best. Health laws of every description constitute, said Chief Justice Marshall, a part of that mass of legislation which "embraces everything within the territory of a State, not surrendered to the General Government; all which can be most advantageously exercised by the States themselves." *Gibbons* v. *Ogden*, 9 Wheat. 1, 203. A decision that the New York statute is void under the Fourteenth Amendment will, in my opinion, involve consequences of a far-reaching and mischievous character; for such a decision would seriously cripple the inherent power of the States to care for the lives, health and well-being of their citizens. Those are matters which can be best controlled by the States.

The preservation of the just powers of the States is quite as vital as the preservation of the powers of the General Government.

When this court had before it the question of the constitutionality of a statute of Kansas making it a criminal offense for a contractor for public work to permit or require his employés to perform labor upon such work in excess of eight hours each day, it was contended that the statute was in derogation of the liberty both of employés and employer. It was further contended that the Kansas statute was mischievous in its tendencies. This court, while disposing of the question only as it affected public work, held that the Kansas statute was not void under the Fourteenth Amendment. But it took occasion to say what may well be here repeated: "The responsibility therefor rests upon legislators, not upon the courts. No evils arising from such legislation could be more far-reaching than those that might come to our system of government if the judiciary, abandoning the sphere assigned to it by the fundamental law, should enter the domain of legislation, and upon grounds merely of justice or reason or wisdom annul statutes that had received the sanction of the people's representatives. We are reminded by counsel that it is the solemn duty of the courts in cases before them to guard the constitutional rights of the citizen against merely arbitrary power. That is unquestionably true. But it is equally true —indeed, the public interests imperatively demand—that legislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the Constitution." *Atkin v. Kansas*, 191 U. S. 207, 223.

The judgment in my opinion should be affirmed.

MR. JUSTICE HOLMES dissenting.

I regret sincerely that I am unable to agree with the judg-

ment in this case, and that I think it my duty to express my dissent.

This case is decided upon an economic theory which a large part of the country does not entertain. If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority to embody their opinions in law. It is settled by various decisions of this court that state constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious or if you like as tyrannical as this, and which equally with this interfere with the liberty to contract. Sunday laws and usury laws are ancient examples. A more modern one is the prohibition of lotteries. The liberty of the citizen to do as he likes so long as he does not interfere with the liberty of others to do the same, which has been a shibboleth for some well-known writers, is interfered with by school laws, by the Post Office, by every state or municipal institution which takes his money for purposes thought desirable, whether he likes it or not. The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics. The other day we sustained the Massachusetts vaccination law. *Jacobson* v. *Massachusetts,* 197 U. S. 11. United States and state statutes and decisions cutting down the liberty to contract by way of combination are familiar to this court. *Northern Securities Co.* v. *United States,* 193 U. S. 197. Two years ago we upheld the prohibition of sales of stock on margins or for future delivery in the constitution of California. *Otis* v. *Parker,* 187 U. S. 606. The decision sustaining an eight hour law for miners is still recent. *Holden* v. *Hardy,* 169 U. S. 366. Some of these laws embody convictions or prejudices which judges are likely to share. Some may not. But a constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the State or of *laissez faire.*

It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States.

General propositions do not decide concrete cases. The decision will depend on a judgment or intuition more subtle than any articulate major premise. But I think that the proposition just stated, if it is accepted, will carry us far toward the end. Every opinion tends to become a law. I think that the word liberty in the Fourteenth Amendment is perverted when it is held to prevent the natural outcome of a dominant opinion, unless it can be said that a rational and fair man necessarily would admit that the statute proposed would infringe fundamental principles as they have been understood by the traditions of our people and our law. It does not need research to show that no such sweeping condemnation can be passed upon the statute before us. A reasonable man might think it a proper measure on the score of health. Men whom I certainly could not pronounce unreasonable would uphold it as a first instalment of a general regulation of the hours of work. Whether in the latter aspect it would be open to the charge of inequality I think it unnecessary to discuss.