Swan, J.
In 2001, Grace 0. Shapiro (“Grace”) opened a credit card account with Citibank (South Dakota), N.A, a national banking association located in Sioux Falls, South Dakota (“Citibank”). The annual percentage rate of interest over the ensuing years while the account was open ranged from 16.49% to 29.99%. In 2002, Michael M. Shapiro (“Michael”) opened a credit card account with Citibank, with an annual percentage rate of from 16.99% to 29.99%. By 2008, both Grace and Michael (collectively, the “Shapiros") were in default on their accounts, and Citibank commenced suit against them in the Haverhill District Court in two separate actions.[2] The Shapiros filed answers denying Citibank’s claims, and filed counterclaims alleging that Citibank was in violation of the Federal usury statute and demanding forfeiture of the interest as a setoff and damages. Over the Shapiros’ opposition, the court below allowed Citibank’s motions to dismiss their counterclaims. Citibank then filed motions for summary judgment, which went unopposed and were allowed. The Shapiros have appealed from those judgments[3] and submit that their counterclaims for usury violations were wrongly dismissed.
The provision of the National Banking Act (“NBA”), 12 U.S.C. §1 et seq., upon which the Shapiros based their counterclaims states that “taking, receiving, reserving, or charging a rate of interest” by a national banking association “greater than is allowed by [12 U.S.C. §85] ... shall be deemed a forfeiture of the entire interest *276 which the ... evidence of debt carries with it,” §86, and if the interest has been paid, the debtor may recover “twice the amount of the interest thus paid from the association taking or receiving the same.” Id An action for forfeiture or damages must be “commenced within two years from the time the usurious transaction occurred.” Id. The NBA prescribes the maximum rate of interest that a national banking association may charge to be at parity with state banks:
Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under title 62 of the Revised Statutes. When no rate is fixed by the laws of the State, or Territory, or District, the bank may take, receive, reserve, or charge a rate not exceeding 7 per centum, or 1 per cen-tum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has to run.
12 U.S.C. §85.
The underlying purpose of 12 U.S.C. §85,[4] in the view of the Supreme Court of the United States, was to give national banks “a firm footing in the different States where they might be located. It was expected they would come into competition with State banks, and it was intended to give them at least equal advantages in such competition. In order to accomplish this they were empowered to reserve interest at the same rates, whatever those rates might be, which were allowed to similar State institutions. This was considered indispensable to protect them against possible unfriendly State legislation.” Tiffany v. National Bank of Mo., 85 U.S. (18 Wall.) 409, 412 (1873). “National banks,” said the Court, “have been National favorites.” Id. at 413.[5]
*277 Citibank’s principal office is in South Dakota. Thus, under 12 U.S.C. §85, Citibank may charge the greater of the “rate allowed” by South Dakota or one percent over the Federal Reserve rate for ninety-day notes in South Dakota, unless there is a “different rate [that] is limited for banks organized under” the laws of South Dakota, in which case the latter limit applies. We need not be concerned with the Federal Reserve rate or the “rate allowed” generally because the South Dakota banking statute is quite clear regarding the rate state banks may charge:
Unless a maximum interest rate or charge is specifically established elsewhere in the code, there is no maximum interest rate or charge, or usury rate restriction between or among persons, corporations, limited liability companies, estates, fiduciaries, associations, or any other entities if they establish the interest rate or charge by written agreement. A written agreement includes the contract created by §54-11-9.
S.D. Codified Laws §54-3.1.1.
A “contract created by” §54-11-9 is a credit card agreement. In addition, regulated lenders, including national banking associations, §54-3-14, are, with exceptions not applicable here, “exempt from all limitations on the rate of interest which they may charge and are further exempt from the operation and effect of all usury statutes.” §54-3-13. In short, under South Dakota law, the rate set forth in a credit card agreement issued by a South Dakota state bank is allowed, whatever that rate may be. By dismissing the Shapiros’ counterclaim, the court below agreed with Citibank’s position that under 12 U.S.C. §85, it may charge interest at the rate allowed by South Dakota law, namely, whatever the credit card agreement sets forth, and that the rates charged the Shapiros were proper.
The Shapiros advance another view and rely on the second sentence of 12 U.S.C. §85 stating that “[w]hen no rate is fixed by the laws of the State,” the maximum rate that a national banking association may impose is the greater of seven percent or one percent over the Federal rate. From this, they conclude that since S.D. Codified Laws §54-3.1.1 sets no maximum rate other than that contained in an agreement, it does not “fix” a rate, and Citibank may thus charge only seven percent.[6] The same argument was made, unsuccessfully, by the appellants in Daggs v. Phoenix Nat'l Bank, 177 U.S. 549 (1900). At issue in Daggs were promissory notes bearing interest at ten percent held by a national bank in what was then the territory of Arizona. The territorial usury statutes stated that “[p]arties may agree in writing for the payment of any rate of interest whatever on money due or to become due on any con *278 tract.”[7] Id at 554. Like the Shapiros, the debtors pointed to 12 U.S.C. §85 as requiring a seven percent rate because, while the territorial statute “allowed” any rate agreed by the parties, there was no “fixed” rate in the Arizona statute. Restating from Tiffany, supra that the whole intent of §85 was to allow national banks to compete favorably with state banks, the Supreme Court rejected the debtors’ position and held that the statutory terms “allowed” and “fixed” were synonymous:
The clear meaning and purpose of these provisions remove the ambiguity of those which follow, if there is any ambiguity. “When no rate is fixedby the laws of the State or territory or district, the bank may take, secure, reserve, or charge a rate not exceeding seven per centum....” “Fixed by the lawá‘ must be construed to mean “allowed by the laws,” not arate expressed in the laws. In instances it might be that, but not necessarily. The intention of the national law is to adopt the state law, and permit to national banks what the state law allows to its citizens and to the banks organized by it (emphasis in original).
Daggs, supra at 555.
When applying Daggs to the instant case, the result is the same. Under South Dakota law, an unlimited rate of interest is “allowed,” i.e., “fixed,” and thus may be charged by Citibank as a national banking association headquartered in that state.
The Shapiros concede that Daggs is the only case on point emanating from the highest Court. But describing the opinion as “aberrant” and “illogical,”[8] the Shapiros’ counsel argue that Daggs stands at odds with other decisions of the Court. It does not. See, e.g., Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. *279 Corp., 439 U.S. 299 (1978) (national bank in one state may charge its out-of-state credit card customers interest rate allowed by its home state, when rate is greater than that permitted by state of bank’s nonresident customers); Evans v. National Bank of Savannah, 251 U.S. 108 (1919) (national bank in Georgia may charge Georgia rate of eight percent); National Bank v. Johnson, 104 U.S. 271 (1881) (national bank in New York could not discount note at twelve percent per annum when interest on loans in New York was limited to seven percent, with Court holding loans and discounts to be treated the same); Farmers’ & Mechanics’ Nat’l Bank v. Dealing, 91 U.S. 29 (1875) (national bank in New York may not charge ten percent when state limit is seven percent). Indeed, the Supreme Judicial Court cited Daggs favorably in concluding that a national bank may charge interest under G.L.c. 140, §90, which permits loans under $1,000.00 at any agreed rate up to eighteen percent. Rockland-Atlas Nat'l Bank of Boston v. Murphy, 329 Mass. 755, 759 (1953). Moreover, as the Shapiros concede, Daggshas never been overruled.[9] Much as they attempt to argue otherwise with theories that we find unpersuasive, the Shapiros’ only hope of success is for us to overrule the Supreme Court. For reasons that should appear obvious, we decline to do so.
Judgment affirmed.
So ordered.

 Although the amounts in controversy differ, both cases raise identical issues, and have been joined on appeal.

 The judgment against Grace was for $12,650.88 on account of credit card principal and finance charges or interest accrued over the life of the account, prejudgment interest of $1,006.52, and costs of $249.40, for a total of $13,906.80. The judgment against Michael was computed the same way — $13,265.50 for principal and interest, $937.67 prejudgment interest, and $249.40 costs, totaling $14,452.57. The Shapiros contest neither their liability for the debts, nor the accuracy of the interest calculations in accordance with the annual percentage rates set forth from time to time in their credit card agreements with Citibank.

 Also cited in other statutes and court decisions as §5197 of the Revised Statutes.

 Congress reaffirmed this statute in the Dodd-Frank Wall Street Reform and Consumer Protection Act: “No provision of this title shall be construed as altering or otherwise affecting the authority conferred by section 5197 of the Revised Statutes of the United States (12 U.S.C. §85) for the charging of interest by a national bank at the rate allowed by the laws of the State, territory, or district where the bank is located, including with respect to the meaning of ‘interesf under such provision.” Pub. L. 111-203, Title X, Subtitle D, §1044(f), 124 Stat. 1376 (2010).

 For the sake of simplicity, we do not hereinafter refer to the alternative Federal Reserve rate, as it is currently lower than seven percent and, thus, not relevant to our discussion.

 The applicable statutes of the territory of Arizona reproduced in the Daggs opinion stated in full as follows:
2161. SEC. 1. When there is no express agreement fixing a different rate of interest, interest shall be allowed at the rate of 7 per cent per annum on all moneys after they become due on any bond, bill, promissory note or other instrument in writing, or any judgment recovered in any court in this Territory, for money lent, for money due on any settlement of accounts from the day on which the balance is ascertained and for money received for the use of another.
2162. SEC. 2. Parties may agree in writing for the payment of any rate of interest whatever on money due or to become due on any contract; any judgment rendered on such contract shall conform thereto, and shall bear the rate of interest agreed upon by the parties, and which shall be specified in the judgment.
Mat 554.

 The reference by the Shapiros’ counsel to Lochner v. New York, 198 U.S. 45 (1905) in an effort to lessen the precedential value of Daggs not only misses the mark, but also is inappropriate.

 Nor, for that matter, has Lochner.