PEOPLE v. CHARLES SCHWEINLER PRESS, Inc.   (No. 6004.)

(Supreme Court, Appellate Division, First Department.   July 10, 1914.)

MASTER AND SERVANT (§ 13*)—HOURS OF SERVICE—POLICE POWER—EMPLOYMENT OF WOMEN.

 Labor Law (Consol. Laws, c. 31), § 93b. added by Laws 1913, c. 83, prohibiting any woman from being employed or permitted to work in any factory before 6 o'clock in the morning or after 10 o'clock in the evening, is a valid exercise of the police power, since it directly tends to preserve the moral and physical well-being of women, upon which the welfare of the race is dependent.

 [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. § 13.*]

 Clark and Dowling, JJ., dissenting.

Appeal from Court of Special Sessions of City of New York.

Charles Schweinler Press, Incorporated, was convicted upon an information charging a violation of section 93b of the Labor Law by employing a woman between the hours of 10 p. m. and 6 a. m., added to the Labor Law by chapter 83 of the Laws of 1913, and from an order suspending sentence the people appeal.  Reversed and remanded.

The court below suspended sentence in this case upon the ground that this enactment was in violation of section 6 of article 1 of the Constitution, which provides that "no person shall   *   *   *   be deprived of life, liberty or property without due process of law," and was also in violation of the fourteenth amendment to the Constitution of the United States, which provides that: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, DOWLING, and HOTCHKISS, JJ.

William A. De Ford, Asst. Dist. Atty. of New York City, for the People.

Alfred E. Ommen, of New York City, for respondent.

Walter Jeffreys Carlin, of New York City, for Association of Ice Cream Manufacturers.

INGRAHAM, P. J.  The sole question presented upon this appeal is whether this statute, chapter 83 of the Laws of 1913, violates either the state or federal Constitution.

---

···¡ In the year 1903, chapter 184 of that year, an act was passed by the Legislature of the state of New York which provided that:

"No female shall be employed, permitted or suffered to work in any factory in this state before 6 o'clock in the morning, or after 9 o'clock in the evening of any day; or for more than ten hours in any one day except to make a shorter work day on the last day of the week; or for more than sixty hours in any one week, or more hours in any one week than will make an average of ten hours per day for the whole number of days so worked."

The question of the constitutionality of that law came before the Court of Special Sessions of the city of New York, which held the act unconstitutional, and therefore suspended sentence after conviction. That determination was affirmed on appeal to this court (People v. Williams, 116 App. Div. 379, 100 N. Y. Supp. 337, 101 N. Y. Supp. 562, and by the Court of Appeals (189 N. Y. 131, 81 N. E. 778, 12 L. R. A. (N. S.) 1130, 121 Am. St. Rep. 854, 12 Ann. Cas. 798). In those decisions it seems to have been conceded that so far as the statute fixed the limitation as to daily and weekly employment, it could have been sustained, but that the provision making it a misdemeanor for an employer to permit or suffer a female employé to work in a factory before 6 o'clock in the morning or after 9 o'clock in the evening of any day was in violation of the state Constitution, and therefore void. The opinion of the Court of Appeals was written by Judge Gray. He cites article 1, § 6, of the Constitution, which provides that "no person shall * * * be deprived of life, liberty or property without due process of law" as the provision of the Constitution which rendered that enactment void, saying:

ப "The provisions of the state and of the federal Constitutions protect every citizen in the right to pursue any lawful employment in a lawful manner. He enjoys the utmost freedom to follow his chosen pursuit, and any arbitrary distinction against, or deprivation of, that freedom by the Legislature is an invasion of the constitutional guaranty. Under our laws men and women now stand alike in their constitutional rights, and there is no warrant for making any discrimination between them with respect to the liberty of person or of contract. It is claimed, however, in this case, that the enactment in question can be justified as an exercise of the police power of the state, having for its purpose the general welfare of the state in a measure for the preservation of the health of the female citizens. * * * In providing that 'no female shall be employed, permitted, or suffered to work in any factory in this state before six o'clock in the morning, or after nine o'clock in the evening of any day,' she is prevented, however willing, from engaging herself in a lawful employment during the specified periods of the 24 hours. * * * I find nothing in the language of the section which suggests the purpose of promoting health, except as it might be inferred that for a woman to work during the forbidden hours of night would be unhealthful. If the inhibition of the section in question had been framed to prevent the 10 hours of work from being performed at night, or to prolong them beyond 9 o'clock in the evening, it might, more readily, be appreciated that the health of women was the matter of legislative concern. That is not the effect, nor the sense, of the provision of the section with which, alone, we are dealing. * * * It is clear, as it seems to me, that this legislation cannot, and should not, be upheld as a proper exercise of the police power. It is certainly discriminative against female citizens, in denying to them equal rights with men in the same pursuit. The courts have gone very far in upholding legislative enactments, framed clearly for the welfare, comfort, and health of the community, and that a wide range in the exercise of the police power of the state should be conceded I do not deny; but, when it is sought under the guise of a labor law, arbitrarily, as here, to pre-

vent an adult female citizen from working at any time of the day that suits her, I think it is time to call a halt. It arbitrarily deprives citizens of their right to contract with each other."

And the court cites, as an authority for its decision the case of Lochner v. State of New York, 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133. From the most careful reading of this opinion it seems to me that the judgment of the court was based upon the fact that the provisions of the statute then under review were not enacted for the welfare, comfort, and health of the community, but that it was sought, under the guise of a labor law, to prevent an adult female citizen from working at any time of the day that suits her, and for that reason the act was condemned.

Turning to the case of Lochner v. New York, 198 U. S. 45, 25 Sup. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133, upon which Judge Gray seems to have principally relied, it was there held that as a labor law pure and simple, the prohibition could not be sustained, and we may assume in this case that as a labor law pure and simple this prohibition, preventing women from working in a factory after 10 o'clock at night, would be unenforceable. It was also held that that law did not affect any portion of the public except an individual engaged in the occupation of a baker, and if the law must be upheld at all, it must be upheld as a law pertaining to the health of an individual engaged in the occupation of a baker. The opinion then discusses the question as to whether the law related to the health of an individual engaged in that occupation, and the court lays it down as a general principle that:

"The mere assertion that the subject relates, though but in a remote degree, to the public health does not necessarily render the enactment valid. The act must have a more direct relation, as a means to an end, and the end itself must be appropriate and legitimate, before an act can be held to be valid which interferes with the general right of an individual to be free in his person and in his power to contract in relation to his own labor. * * * We think the limit of the police power has been reached and passed in this case. There is, in our judgment, no reasonable foundation for holding this to be necessary or appropriate as a health law to safeguard the public health or the health of the individuals who are following the trade of a baker. * * * We think that there can be no fair doubt that the trade of a baker, in and of itself, is not an unhealthy one to that degree which would authorize the Legislature to interfere with the right to labor, and with the right of free contract on the part of the individual, either as employer or employé."

And then, in finally condemning the law, the court said:

"It seems to us that the real object and purpose were simply to regulate the hours of labor between the master and his employés (all being men, sui juris) in a private business, not dangerous in any degree to morals, or in any real and substantial degree to the health of the employés. Under such circumstances the freedom of master and employé to contract with each other in relation to their employment, and in defining the same, cannot be prohibited or interfered with, without violating the federal Constitution."

From that opinion four justices of the court dissented upon the ground that the statute was enacted in order to protect the physical well-being of those who work in bakery and confectionery establishments, and the reason in the dissenting opinion is based upon the fact that the number of hours during which workmen should continuously

labor in particular occupations involving the physical strength and safety of workmen is one within the general control of the states.

Since these two cases were decided the question of the effect of continuous labor and the hours of labor as affecting the moral and physical health of women has been the subject of considerable investigation and discussion, and I think it may fairly be said that it has come to be generally recognized both in the legislative and judicial departments of the United States and of several of the states, that the state is largely interested in conserving both the morals and physical condition of women. By the common law, when the federal Constitution and the Constitution of the state of New York were first adopted, the equality of the sexes was not recognized, nor was it in either the federal Constitution or in the Constitution of this state. The "subjection of woman" was recognized by the law of the land. No married woman could make a contract which was binding upon her or her husband without his consent; the wages of all married women when earned became the property of the husband; and the equality of women to contract or to enjoy the fruits of their labor were certainly not protected by any provision of the federal or state Constitutions with which I am acquainted. The law now, as then, recognizes a distinction between the sexes, and justifies legislative enactment for the protection of women which have not been and are not now considered necessary in the case of men. Many sections of the Penal Law of New York can be cited which are deemed necessary to protect women from the assaults and solicitations of men, even in cases where their consent is not wanting. Certainly the question of female prostitution is one that is intimately connected with the morals of the people, and universal experience has shown that it is the female sex that is exposed to the greatest danger. And from the purely physical standpoint the danger of the impairment of the health of women is equally obvious. Upon the health of women as the child-bearing sex necessarily depends the future health of the succeeding generation. Any occupation that tends to lower the vitality of woman and interferes with her bearing healthy children directly impairs the health and capacity of future generations, and is a subject of the utmost public concern. So that, it seems to me, both from a moral and physical standpoint, to regulate the work of women both as to the nature of the occupation at which they work and the hours that they work has a direct bearing upon the welfare of the state and of future generations. This question has of late years received much attention from those engaged in the investigation of problems of this character, and there is submitted by the people as part of their argument what is called "A Summary of Facts of Knowledge" on this subject, which contains the reports and investigations of various scientists and scientific bodies on the subject of work, and especially of the effect of night work upon both men and women. From this summary it can be seen how much the question has been studied within the last 10 or 15 years. The necessity of healthful rest is emphasized. The bad effects of night work upon the individual seems to be the unanimous opinion of all those who are qualified to judge. And that the practical effect of\

the lack of normal rest upon women is more pronounced than upon men seems to be recognized by the universal opinion of those who have investigated the subject.

As a consequence of this research the Legislature, by chapter 561 of the Laws of 1911 and chapter 21 of the Laws of 1912, provided for a Factory Investigating Commission, which was authorized to inquire into the conditions under which manufacture is carried on throughout the state, and to recommend to the Legislature such remedial legislation as it should find necessary and desirable, under the conditions as discovered by its investigation, to protect the health and welfare of workers in factories. That investigation seems to have been quite thoroughly conducted, and resulted in a report to the Legislature which, among other remedial legislation, recommended the enactment of the statute now under consideration. The report of that commission is startling, both in regard to the effect on the physical well-being of the night workers and the moral effect upon the women who are employed in factories at night. Those conditions were not and could not have been presented to the court when the former statute was under review, and certainly would not justify the observation that Judge Gray made in People v. Williams, supra:

"I find nothing in the language of the section which suggests the purpose of promoting health, except as it might be inferred that for a woman to work during the forbidden hours of night would be unhealthful."

And it was in consequence of this report to the Legislature, the facts there disclosed, and the recommendation of the commission, that the act in question was passed. The act, as recommended by the commission and as passed by the Legislature, provided as follows:

"Period of Rest at Night for Women.—In order to protect the health and morals of females employed in factories by providing an adequate period of rest at night, no woman shall be employed or permitted to work in any factory in this state before six o'clock in the morning or after ten o'clock in the evening of any day."

If the facts as now presented are true, and they are based upon the official report of a commission authorized by law to investigate the subject, and if women who work in factories at night are exposed to dangers which affect them both physically and morally, and which justify under the police power legislation for their protection, this legislation is directed to accomplish that purpose. There is here disclosed, as the general result of a scientific investigation by the state into the conditions existing in the factories of the state, a condition which would subject a large proportion of the women of the state to both physical and moral danger from its continuance, and we have legislation directly enacted for the purpose of procuring as to a large proportion of the people the prevention of physical and moral impairment. Such legislation I conceive to be within the police power of the state.

That this condition is recognized outside of this state is apparent from the fact that in at least seven states statutes have been passed prohibiting the employment of women during the nighttime, and, so far as appears, none of these statutes have been held to violate any

constitutional provision. It has always been recognized in New York that if a statute has a reasonable connection with the public health, welfare, and safety, it is within the police power. See People v. Ewer, 141 N. Y. 129, 36 N. E. 4, 25 L. R. A. 794, 38 Am. St. Rep. 788. In Muller v. Oregon, 208 U. S. 412, 28 Sup. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957, the question before the court was whether an act of the state of Oregon which prohibited the employment of a female in any factory or laundry in the state for more than 10 hours during any one day was void. This statute was held within the police power by the state courts, and the question presented to the Supreme Court was whether it violated any provision of the federal Constitution. The opinion, after calling attention to the Lochner Case, supra, called attention to the summary submitted on behalf of the people in this case, and it is spoken of as "a very copious collection of all these matters." The court discusses the position of women, and states as a fact of common knowledge:

"That woman's physical structure and the performance of maternal functions place her at a disadvantage in the struggle for subsistence is obvious. This is especially true when the burdens of motherhood are upon her. Even when they are not, by abundant testimony of the medical fraternity, continuance for a long time on her feet at work, repeating this from day to day, tends to injurious effects upon the body, and as healthy mothers are essential to vigorous offspring, the physical well-being of woman becomes an object of public interest and care in order to preserve the strength and vigor of the race. * * * Though limitations upon personal and contractual rights may be removed by legislation, there is that in her disposition and habits of life which will operate against a full assertion of those rights. She will still be where some legislation to protect her seems necessary to secure a real equality of right. Doubtless there are individual exceptions, and there are many respects in which she has an advantage over him; but, looking at it from the viewpoint of the effort to maintain an independent position in life, she is not upon an equality. Differentiated by these matters from the other sex, she is properly placed in a class by herself, and legislation designed for her protection may be sustained, even when like legislation is not necessary for men and could not be sustained. It is impossible, to close one's eyes to the fact that she still looks to her brother and depends upon him. Even though all restrictions on political, personal, and contractual rights were taken away, and she stood, so far as statutes are concerned, upon an absolutely equal plane with him, it would still be true that she is so constituted that she will rest upon and look to him for protection; that her physical structure and a proper discharge of her maternal functions—having in view not merely her own health, but the well-being of the race—justify legislation to protect her from the greed as well as the passion of man. The limitations which this statute places upon her contractual powers, upon her right to agree with her employer as to the time she shall labor, are not imposed solely for her benefit, but also largely for the benefit of all. Many words cannot make this plainer. The two sexes differ in structure of body, in the functions to be performed by each, in the amount of physical strength, in the capacity for long-continued labor, particularly when done standing, the influence of vigorous health upon the future well-being of the race, the self-reliance which enables one to assert full rights, and in the capacity to maintain the struggle for subsistence. This difference justifies a difference in legislation, and upholds that which is designed to compensate for some of the burdens which rest upon her. * * * The reason runs deeper, and rests in the inherent difference between the two sexes, and in the different functions in life which they perform."

And this opinion was concurred in by all the Justices of the Supreme Court of the United States.

In·view of this judgment of the same court that pronounced the judgment in the case of Lochner v. New York, supra, mainly relied upon by the Court of Appeals in the Williams Case, supra, to sustain its judgment there, further discussion as to the power of the Legislature to legislate for the protection of women would seem to be unnecessary. With the facts and conditions existing in New York, now before the court, it certainly cannot be said that this legislation is not directly concerned with the moral and physical well-being of women, or does not tend to her protection and the welfare and well-being of all the people of the state. Entertaining these views, as the result of the scientific investigation of the question and the trend of legislation in the various states of this country and foreign countries, it seems to me that this act has a direct effect upon the well-being of women and of the race; was within the police power of the state; violates no provision of either the federal or state Constitution; and our decision is not controlled by People v. Williams, supra.

For these reasons I advise the reversal of the order appealed from and a denial of the motion in arrest of judgment.

LAUGHLIN, J., concurs.

HOTCHKISS, J. (concurring). "It is open to serious question, which I leave to the reader's pondering, whether, among national manufactures, that of Souls of a good quality may not at least turn out a quite leading lucrative one." These words of John Ruskin fall less strangely on our ears than on those of the generation of 1860 to which they were first addressed. The reason why is not difficult to understand. In the 50 odd intervening years the world has traveled far. With the  introduction of machinery and factory labor, new problems, social, political, and economic, arose and developed rapidly. Their existence, at first apparent to but few, had to be recognized by many before practical means for their amelioration could be agreed on and formulated into laws. In a general way, so far as legislation was concerned, these measures intended for the public good commonly curtailed individual liberty; Civilization has always made its way by similar restrictions. In this country, our written constitutions,·particularly when interpreted in the light of precedents arising under materially different conditions, were found to be obstacles in the way of many projected laws. The liberty to contract or to employ one's labor in any lawful occupation, and to the extent which his needs or his desire might dictate, has been·one of the grounds on which strenuous opposition to much of our social legislation has been based. That the people, acting through their legislature, have the right to pass laws to protect the race, is indisputable. If it is lawful to prohibit individual suicide by violence, it must equally be lawful to prevent bodies of men from destroying or materially injuring themselves by harmful labor. But watchful as courts should always be to see that the liberty of the individual is not unlawfully. and insidiously invaded by laws ostensibly enacted for his benefit, many acts have been declared unconstitutional because, within reason, they bore no relation to the

condition or peril to which they purported or were claimed to be directed, and it is on this ground, as I read it, that in the Williams Case (People v. Williams) 189 N. Y. 131, 134, 81 N. E. 778, 779 (12 L. R. A. [N. S.] 1130, 121 Am. St. Rep. 854, 12 Ann. Cas. 798), the act of 1903 was declared void. Says Judge Gray:

"I find nothing in the language of the section which suggests the purpose of promoting health, except as it might be *inferred* that for a woman to work during the forbidden hours of night would be unhealthful."

And again (189 N. Y. 134, 135, 81 N. E. 779, 12 L. R. A. [N. S.] 1130, 121 Am. St. Rep. 854, 12 Ann. Cas. 798):

"If the inhibition of the section in question had been framed to prevent the 10 hours of work from being performed at night, or to prolong them beyond 9 o'clock in the evening, it might, more readily, be appreciated that the health of women was the matter of legislative concern. That is not the effect, nor the sense, of the provision of the section with which alone we are dealing. It was not the case upon which this defendant was convicted."

No such language is applicable to the statute of 1913 here involved. Its title expressly recites that it is directed "to protecting the health and morals of females employed in factories by providing an adequate period of rest at night," and its text, directly in furtherance of its title "in order to protect the health," etc., of women so employed, prohibits such employment before 6 a. m. and after 10 p. m. We should be closing our eyes to notorious and undisputed facts if we did not take notice that between the years 1903 and 1913 investigations pursued in almost every country of Europe, as well as in this country, had demonstrated the harmfulness to women of factory labor as it is commonly pursued, and especially of such labor at night. The act under consideration was the result of a report made to the Legislature by a factory investigating commission, by which the original act was proposed. No one who has read that report can, for a moment doubt the propriety of the act, having regard for the conditions in this state disclosed by the report. The voluminous Summary of Facts of Knowledge submitted by the learned counsel for the appellant shows how fully the act is in line with world-wide legislation. Under these circumstances, and uncontrolled by binding authority in our own state, the decision of the Supreme Court in Muller v. Oregon, 208 U. S. 412, 28 Sup. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957, furnishes ample precedent for holding the act to be valid.

The order should be reversed.

CLARKE, J. However much I might concur with the views of the Presiding Justice, I think this intermediate court is bound to follow the judgment of the court of last resort. If the Williams Case is no longer an authority, it is for the Court of Appeals to say so. We have no power to review their decision.

I, therefore, feel myself constrained to dissent upon that case.

DOWLING, J., concurs.