Matter of **CUT RATE FURNITURE CO., Inc., Bankrupt.**

No. 37458.

United States District Court
N. D. New York.
June 13, 1958.

Anthony J. Feeney, Jr., Albany, N. Y., for Morton M. Z. Lynn, trustee for Cut Rate Furniture Co., Inc., petitioner.

Arthur J. Harvey, Albany, N. Y., for A. J. Armstrong Co., Inc., respondent.

FOLEY, District Judge.

Two petitions for review in this bankruptcy matter are filed as to a decision and order of Referee Ryan, dated July 29,

1957; one by the Trustee in Bankruptcy, the petitioner below, and one by A. J. Armstrong, Inc., the respondent below. Each petition challenges certain findings and conclusions adverse to contentions made before the Referee, i. e. each side is satisfied with one part or phase of the decision and discontent with the other portion not in its favor. Usually, when you have such dissatisfaction by both sides it is an augury of perfect decision.

The problem presented has been a difficult one for me to grasp and analyze with a fair degree of good comprehension. The facts as made in the Record before the Referee are not too involved when stated [1] but the application of the law to these practically undisputed facts has been tricky and evasive for my mind. The pulse of the situation is the facts and the legal answer rests mainly upon the much discussed principles as to certain commercial transactions laid down long ago by Justice Brandeis in Benedict v. Ratner, 1924, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991. My approach and consideration has been slow and cautious mainly because of my high regard for the competence and judgment of the Referee evidenced often in his sound disposition of these intricate financial questions that are so vital to the heartbeat of the business world. The usual clarity and detail is again present in his decision but despite persuasive reasoning that gave prolonged hesitation and doubt on my part I am inclined to disagree as to one phase of his conclusions.

The facts can be generalized. A. J. Armstrong, Inc., at least in this instance, is in the business of advancing money to retail merchants (as Cut Rate Furniture, Inc., was in the sale of furniture to the public), upon the security of the assignment of accounts receivable from the sale of the merchandise and/or the pledge of the merchandise inventory itself. In our situation here, the continuing transactions between Armstrong and Cut Rate from 1952 to 1955 relating to the advance and loan of money encompassed both methods of agreement as to security. When the merchandise itself is so pledged or liened, together with the proceeds thereof, Armstrong would be known in the trade as a "factor", and also come within such description as set forth in Section 45 of the Personal Property Law of New York, McKinney's Consol.Laws, c. 41, the terms of which shall become of the utmost importance in this discussion.

By written agreement dated August 5, 1952, Armstrong and Cut Rate entered into a contract or "Accounts Receivable Agreement" whereby Armstrong agreed to advance moneys to Cut Rate upon acceptable accounts receivable. (Trustee's Exhibit 1.) Apparently, such agreements are often used, and pursuant to it both parties cooperated in an elaborate system of supervision, control, audit, reporting, checking and verification over the accounts receivable; actually conditional sales contracts forwarded to Armstrong after being signed by the customers who bought the furniture at the Cut Rate store.

This detail, of course, was performed to a great extent as Armstrong requested it and on its forms and reports because the cold fact of life was present that Armstrong had the money and apparently Cut Rate needed it. The witnesses at the trial, Mr. Greenspan of Armstrong, and Mr. Steinberg of Cut Rate, agreed that this detail was carried out as to this agreement. (R. 155, 197, 202, Exhibits B, C.) Substantial moneys in the neighborhood of one million dollars were involved from 1952 to 1955 in these account receivable transactions. (R. 207.)

An important event occurred on June 23, 1954. Cut Rate filed a petition for an arrangement with its creditors under a Chapter XI proceeding of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. and was allowed to remain as a debtor in possession in the conduct of its business during the proceeding. Apparently, money was needed to consummate the plan for arrangement and Armstrong agreed to advance Cut Rate $16,200 as

---

1. References (R) throughout are to the Record of the hearings before the Referee.

debtor in possession. This new agreement entitled "Supplement" dated September 27, 1954, in one portion states that it shall be attached to and constitute a part of the original Accounts Receivable Agreement.. This agreement, by its terms, purported to bestow upon Armstrong a continuing, general factor's lien in accordance with the broad provisions of Section 45 of the New York Personal Property Law. By an order dated October 4, 1954, the Referee upon the ex parte application of Cut Rate as debtor in possession in the arrangement proceeding, authorized it as such to execute this "Supplement" agreement as of September 27, 1954, and consent to the filing of Notice of Lien, as attached to the application in the Albany County Clerk's Office pursuant to Section 45 of the Personal Property Law of New York. This filing was done and an exhibit seems to indicate that the Notice of Lien was also filed in the Office of City Register, New York County, although not necessary under the order of the Referee. (Trustee's Exhibit 3.) Thereafter, the record discloses the parties carried on about the same as previously except that now, because the lien extended to the merchandise itself, there were weekly reports of inventory filed by Cut Rate with Armstrong (Exhibit D). It is worthy of note that in June 1954, when Cut Rate became a debtor in possession, Armstrong asked Cut Rate to have a credit man to work in Cut Rate's store and supervise the accounts. A Mr. Leahy was so hired and he made weekly reports to Armstrong and passed on new credits and paper assigned to Armstrong. (R. 126, 127, 162.) Also, during this period, as I read the record, conditional sales agreements affecting the merchandise under the factor's lien were still assigned in the same manner to Armstrong, reported and supervised exactly as done before September 27, 1954. (R. 76, 135.) Under the factor's lien agreement besides the advance of $16,200, new advances by Armstrong and several substantial repayments by Cut Rate were made during the ensuing months, leaving a computed balance due of $16,835.44 as of August 1, 1955. (R. 193, 194.) The last repayment by Cut Rate was in March, 1955, and Cut Rate was adjudicated a bankrupt on May 6, 1955.

First, as to the August 5, 1952 agreement, the Referee found and concluded that the transactions under this "Accounts Receivable Agreement" were so conducted that at no point thereunder did Armstrong agree or acquiesce in reservation by Cut Rate of dominion over the assigned accounts receivable or proceeds thereof inconsistent with the effective disposition of title and creation of a lien. (Findings 4, 5. Conclusions 1, 2—Referee's decision.)

This part of the decision, in my judgment, is unalterably right under the evidence before the Referee. It is difficult to imagine what more dominion or supervision could have been employed by Armstrong, and I say in humor that after Mr. Leahy came into the Cut Rate store in behalf of Armstrong's interest in June 1954, the only next step imaginable would be to have the FBI drop in occasionally and look over the situation. In a recent case in the Court of Appeals, Second Circuit, Matter of New Haven Clock & Watch Company (First National Bank of Chicago v. O'Keefe) 253 F.2d 577, Judge Medina gives recent discussion to the Benedict v. Ratner doctrine and interprets succinctly the rule to require the creditor to so "police" the accounts receivable that the debtor does not reserve dominion over them. The facts here indicate clearly that under the August 5, 1952, agreement and its transactions such was done.

As to the Supplement Agreement dated September 27, 1954, which the Referee authorized Cut Rate to enter by order dated October 4, 1954 and referred to by the parties and the Referee as a factor's lien agreement, the Referee reached a contrary conclusion. It was: "That the transactions and conduct of the parties to the September 27, 1954 factor's agree-

ment were such as to render said agreement of September 27, 1954 illegal and void in its entirety." (Conclusion 3 of Referee's Decision.)

The basis for this conclusion is the fact established in the testimony that after the execution of the factor's lien agreement the parties conducted their affairs as they had been doing under the Accounts Receivable Agreement. The important feature which the Referee found fatal to the Supplement or factor's lien agreement was the free and quick admission by Mr. Greenspan of Armstrong that the down payments were kept by Cut Rate and not forwarded or deposited in the account of Armstrong, and such procedure was his understanding of the factor's agreement. (R. 79, 80.) There are no specifics I find in the testimony as to the amount of down payments received by Cut Rate over the intervening months to the date of bankruptcy. If the amounts involved as down payments were to be considered as important, the overall picture indicates mainly a credit business with small down payments, and there was testimony that actually 95% or 98% of the sales were in the form of accounts receivable, and any cash sales for the full amount of articles were reported to Armstrong and they made return checks to Cut Rate. (R. 76, 77.) However, my disagreement with the Referee is based upon other considerations.

A copy of the factoring agreement, as I find it in the Record, is attached to the order of authorization of the Referee dated October 4, 1954, the agreement itself being dated September 27, 1954. There is also attached a copy of the Notice of Lien in the form prescribed by the Statute admittedly filed properly in two public filing offices. The agreement is a printed form and just as wordy as Section 45 of the Personal Property Law upon which it is based. Paragraph 3 of the agreement confers among many other things upon Armstrong a continuing general factor's lien upon all the merchandise of Cut Rate "and upon any accounts receivable *or* other proceeds resulting from the sale or other disposition of such merchandise \* \* \*." (Italics mine.) Much of the wording of this paragraph is in the terms of the first paragraph of Section 45, and the last quoted part is as exactly set forth in the Statute except for the elimination of the words "goods and" before merchandise. The next paragraph, 4, is the one to which the Referee attaches the great weight to conclude that the parties did not live up to the written agreement into which they entered. The result being, in his judgment, that dominion was actually reserved to such extent by Cut Rate, contrary to the writing, that the factor's lien, legal in its inception on the merchandise and proceeds, became illegal and void in its entirety. It states:

"4. All accounts receivable *and* other proceeds resulting from the sale of any of said merchandise shall be your property, and shall be reported, assigned and delivered to you. Such accounts receivable shall be governed by the provisions of the Accounts Receivable Agreement." (Italics mine.)

It is obvious that the retention of down payments by Cut Rate would not be in accord with a strict and confined construction of this wording alone, although the simple description "down payments" is not used at all.

But my impression here, and it may be based mainly upon instinct, is that the retention of down payments was considered by the parties to be in accord with their written contract as a whole and that was their honest business understanding, with no purpose at all to mislead, deceive or defraud.

The conduct of the parties is controlling despite the written agreement (Bloch v. Mill Factors Corp., 2 Cir., 134 F.2d 562, 563), but there is no bar I read or can infer in Section 45 of the Personal Property Law to the retention of down payments that would invalidate the factor's lien. The Notice of Lien, as the one

herein, only needs to set forth the specified formal elements of the Section, and there is no requirement for the public filing of the detailed agreement.

[4] The Benedict v. Ratner principle has been much discussed and oft-distinguished and criticized. An excellent review of these discussions and the impact of Section 45 upon the Benedict principle is contained in a lengthy report of Referee Sydney A. Fine to the Supreme Court of the State of New York dated December 12, 1955. It would be unwise to plagiarize, because the report (General Phoenix Corp. v. Malyon et al.) has been filed with Referee Ryan and furnished to me on this review. As Referee Ryan noted, it is not controlling as judicial authority because it did not receive judicial sanction, apparently not reaching that stage. However, I consider it as most persuasive and logical in the same sense I would a legal treatise or law review article; in fact, as more influential to me because it pertains to a real problem. Therefore, I ask that pages 34–40 of the Report in which the Benedict principle is discussed be photostated or copied in some manner by the Attorney for the Respondent and filed with the Clerk of the Court as an Appendix to this decision. However, I treat it only as a good review of a complex problem, and feel my conclusion that the factor's lien is valid and subsisting here both as to the remaining inventory and accounts receivable arising from such inventory can be supported by the particular facts involved. It is unnecessary to assume completely the broad and well-reasoned conclusion of Referee Fine (now Supreme Court Justice, New York), that Section 45 of the Personal Property Law, if properly followed renders inapplicable the Benedict rule and the companion rule of New York regarding chattel mortgages at least as to the remaining inventory of merchandise.

In Bloch v. Mill Factors Corp., supra, 134 F.2d 562, the Court of Appeals, Second Circuit, sidestepped the contention that the rule of Benedict v. Ratner has been abrogated by Section 45 of the New York Personal Property Law. However, in the first Bloch appeal, 2 Cir., 119 F.2d 536, 538, 134 A.L.R. 1188, Judge Learned Hand gave his thoughts on Section 45: "* * * Second, the purpose of the section is in accord. It has two objects; (1) to provide means by which a merchant's creditors can learn of any encumberance upon goods which he carries on his shelves; (2) to allow him to pledge his accounts without notice to his creditors. * * * The purpose was therefore to prevent merchants from gaining credit from an 'ostensible' ownership, but to leave them free to pledge their other property. * * * ". Also, in a Per Curiam opinion, the Second Circuit affirmed the thought: "* * * A lien under the act is an alternative to a chattel mortgage or common-law pledge. * * *" In re Comet Textile Co., D.C. N.Y., 15 F.Supp. 963, 964, affirmed 2 Cir., 91 F.2d 1008. There was enough similarity between a chattel mortgage and a factor's lien to take the question to the highest court in New York. Utica Trust & Deposit Co. v. Decker, 244 N.Y. 340, 347, 155 N.E. 665.

It must be kept in mind that the Benedict v. Ratner doctrine by the factual situation presented related solely to accounts receivable. It must also be remembered that the facts there show a secret transaction devoid of any control whatever in such manner that Judge Medina in The New Haven Clock & Watch Co. case, supra [253 F.2d 579], characterizes the transaction as "an assignment of accounts in name only." Also, as Justice Holmes, dissenting in Lochner v. People of the State of New York, 198 U.S. 45, 74, 25 S.Ct. 539, 547, 49 L.Ed. 937, cautions: "General propositions do not decide concrete cases."

I attach great importance to footnote 11, 268 U.S. at page 361, 45 S.Ct. at page 568, in Benedict v. Ratner because in my judgment Justice Brandeis foresaw the broad scope of Section 45 of the New York Personal Property Law as to the

retention of possession (of chattels) by the *mortgagor* with power of sale for his own benefit. (Italics mine.) The importance of this footnote and its effect on inventory and chattels is emphasized in Manchester National Bank v. Roche, 1 Cir., 186 F.2d 827, 833. See also Colbath v. Mechanicks National Bank, 96 N.H. 110, 70 A.2d 608. The Legislature of New York has jumped to the breach on several occasions by amendments after several court decisions indicating, as expressed in the Statute itself, intent for liberality of construction. Irving Trust Co. v. Lindner & Bro., Inc., 1934, 264 N.Y. 165, 190 N.E. 332; Bloch v. Mill Factors Corp., 2 Cir., 1943, 134 F.2d 562.

In Benedict v. Ratner, 268 U.S. at page 364, 45 S.Ct. at page 569, when the comparison is made as to chattel mortgages the words used are "unrestricted dominion over the proceeds", "full control", "unfettered use". We have nothing like that here in relation to the goods upon which the factor's lien was placed. Also, this is not the situation set forth in Skilton v. Codington, 185 N.Y. 80, 92, 77 N.E. 790.

Weekly reports of the inventory on hand were made by Cut Rate to Armstrong (R. 75, Exhibit D). Separate books were kept as to factor's lien transaction. (R. 66, 203.) The advances made were based upon the amount of inventory after the factor's lien agreement was entered into (R. 178), and such cash advances were related to the inventory on hand and did not exceed 65% of the value of the inventory shown on the weekly reports. (R. 206.) Substantial payments were agreed to be made by Cut Rate under the factor's lien agreement (R. 106), and substantial repayments under the agreement were actually made until Cut Rate got deeper into financial difficulty. (R. 193, 194.) Even furniture repossessed was put in inventory and reported to Armstrong on a weekly basis and deducted from inventory when resold. (R. 135.) With this array of domination as to inventory, I am inclined to the reasoning that there is nothing approaching "unfettered dominion" of the inventory although Armstrong might not have insisted on the full measure of its rights, if such were the actual agreement as to down payments, and at most there is waiver only of the down payments. Southern Kraft Corp. v. Standard Capital Corp., Sup., 27 N.Y.S.2d 238; affirmed 268 App.Div. 959, 51 N.Y.S.2d 571; affirmed 294 N.Y. 937, 63 N.E.2d 121 (without opinions); Chapman v. Emerson, 4 Cir., 8 F.2d 353; Manchester National Bank v. Roche, supra. In my judgment the inventory transactions are well within the spirit and intent of Section 45. It may be that this Section does not allow "unfettered dominion" or free-wheeling with inventory by the person creating the lien, even when its conditions are followed, but such was not the actual fact here.

Assuming arguendo that the Referee is right in his conclusion that the factor's lien agreement was rendered illegal and void by the retention of down payments as to the inventory on hand, I still would be unable to agree that the accounts receivable under the factor's lien agreement must also fall. These accounts receivable were handled with the same integrity of detailed supervision and control as previous to the factor's lien agreement with more checking, if anything. (R. 135, 175, 197, 202, 203.) There was no dominion at all inconsistent with the Benedict doctrine, as applied to accounts receivable transactions. Further, the accounts receivable under the factor's lien here were formally assigned as previously, and in my judgment have added support from Section 45 whether the factor's lien on the merchandise is effective or not. This wording is in the fourth paragraph: " * * * Provided, moreover, that the making and delivery of any such further or formal assignment shall, *in and of itself*, give to the assignee, a right to or lien upon the account receivable assigned and the proceeds thereof * *." (Italics mine.)

The conclusory statement in Finding of Fact No. 7 is vacated and reversed, as is Conclusion of Law No. 3 and the order based thereon to the effect that the September 27, 1954, factor's lien agreement is illegal and void. Otherwise, the findings and conclusions are confirmed.

The petition to review by Armstrong is granted to the extent indicated, and the petition to review filed by the trustee is denied and dismissed.

It is so ordered.