Gabrielli, J.
(dissenting). Without making any effort to define its boundaries or limitations, a majority of my colleagues has recognized for the first time a constitutional right of personal autonomy broad enough to encompass at least the freedom to indulge in those sexual practices which have long been proscribed by our criminal law. Although the majority has attempted to associate this “fundamental right” with the recent Supreme Court decisions creating a “zone of privacy” to protect certain familial decisions, it is apparent that the connection between this case and those decisions exists only on the most superficial level and that the right of sexual choice established today is really a wholly *495 new legal concept bearing little resemblance to the familiar principles enunciated in Griswold v Connecticut (381 US 479) and its progeny. Because I cannot concur in the substance of the majority’s conclusion and because I am concerned with the majority’s failure to articulate an analytical framework for resolving future claims under this amorphous concept of personal autonomy, I am compelled to cast my vote in dissent.
I begin with the premise that none of the cases relied upon by the majority stand for the proposition that there is a generalized right of privacy or personal autonomy implicit in the Federal Bill of Rights. Nor do the cases cited in the majority opinion provide support for the idea that the courts may invoke the due process clause of the Fourteenth Amendment as a predicate for striking down penal provisions which some members of the judiciary may find distasteful or inconsistent with their own notions of fundamental fairness. Indeed, were that not the case, we could not have held as we recently did in People v Shepard (50 NY2d 640) that the statutory ban on the private possession of marihuana (see Penal Law, § 220.03) is not an unconstitutional infringement of the right of an individual to do as he pleases in his own home. To the contrary, had we concluded in Shepard as the majority seems to have concluded in this case that the freedom to choose one’s own form of sensory gratification within the confines of one’s own home is a constitutionally protected “fundamental” right, we could not have sustained the statute at issue in that case on the basis of mere “rationality”, but would instead have been duty bound to conduct a more searching inquiry to determine whether the State’s interest in the legislative ban was truly “compelling” (see, e.g., Roe v Wade, 410 US 113; Shapiro v Thompson, 394 US 618; Griswold v Connecticut, 381 US 479, supra).
Arguing that the People have failed to demonstrate that individuals who engage in consensual acts of sodomy are likely to suffer any serious physical side effects, the majority has attempted to distinguish the statutory prohibition at issue in Shepard from that at issue in this case by stressing that the ban which we upheld in Shepard was justified by a *496 rational legislative finding that marihuana use can be physically harmful (pp 490-491). This assertion, however, represents a seriously flawed understanding of the inquiry that must be pursued in identifying such rights.
In order to determine whether the freedom to engage in a particular activity is a constitutionally protected “fundamental right”, we must look directly to the specific guarantees outlined in the body of the Constitution and the Bill of Rights and to the “penumbras, formed by emanations from those guarantees]” (Griswold v Connecticut, 381 US 479, 484, supra). The nature and extent of the State’s interest in regulating or proscribing the activity in question are simply not relevant considerations at this stage of the inquiry. Indeed, it is only after the court makes a threshold determination as to whether a particular State regulation impinges upon a “fundamental right” that such considerations are brought into play. If it is determined, for example, that a “fundamental right” is being impaired, the regulation at issue cannot be sustained unless it is narrowly tailored to effectuate some “compelling” governmental interest, such as the State’s interest in protecting the health of its citizens (see Roe v Wade, 410 US 113, supra; Shapiro v Thompson, 394 US 618, supra). On the other hand, once it is established that no “fundamental rights” are at issue, the court may uphold the State enactment if it is merely rationally related to some legitimate governmental purpose which falls within the State’s broad police powers (e.g., People v Shepard, 50 NY2d 640, supra). By suggesting that the activity proscribed in this case involves a “fundamental right” simply because it entails no significant danger to health, the majority has created a truly circular constitutional theory and has, in effect, injected an additional level of confusion into this already rather murky area of the law.
Under the analysis utilized by the majority, all private, consensual conduct would necessarily involve the exercise of a constitutionally protected “fundamental right” unless the conduct in question jeopardizes the physical health of the participant. In effect, the majority has held that a State statute regulating private conduct will not pass constitutional muster if it is not designed to prevent physical harm *497 to the individual. Such an analysis, however, can only be based upon an unnecessarily restrictive view of the scope of the State’s power to regulate the conduct of its citizens. In my view, the so-called “police powers” of the State must include the right of the State to regulate the moral conduct of its citizens and “to maintain a decent society” (Jacobellis v Ohio, 378 US 184, 199, quoted in Paris Adult Theatre I v Slaton, 413 US 49, 59-60). Indeed, without mentioning specific provisions, it is apparent that our State’s penal code represents, in part, an expression of our society’s collective view as to what is or is not morally acceptable conduct. And, although the Legislature may not exercise this power in a manner that would impair a constitutionally protected “fundamental right”, it begs the question to suggest, as the majority has, that such a right is necessarily involved whenever the State seeks to regulate conduct pursuant only to its interest in the moral well-being of its citizenry.
We may avoid the circularity in the majority’s reasoning in cases such as this only if we utilize a two-tiered approach, taking care to ascertain at the outset whether a “fundamental right” is actually implicated without regard to the nature of the governmental interest involved in the challenged statute. If no such right is found to exist, we must refrain from interfering with the choice made by the Legislature and rest content upon the assurance that when the challenged statute is no longer palatable to the moral sensibilities of a majority of our State’s citizens, it will simply be repealed.
Although our decision to sustain the statute challenged in Shepard under settled principles of judicial restraint would seem dispositive of the issue in this case, the majority has nonetheless adopted a contrary view and has placed the claim of personal autonomy asserted by defendants in the category of those ill-defined fundamental rights which are protected by the “penumbras” emanating from the Bill of Rights (Griswold v Connecticut, supra, at pp 484-485) and by the concept of ordered liberty implicit in the due process clause of the Fourteenth Amendment (Roe v Wade, supra, at pp 152-153). I cannot agree, however, that the right of an individual to select his own form of sexual gratification should *498 stand on any better footing than does the right of an individual to choose his own brand of intoxicant without governmental interference. Admittedly, the issue in this case is superficially distinguishable from the issue in Shepard, in that here we are concerned with a claim involving freedom of sexual expression, and it is therefore tempting to equate the “right” asserted by defendants with other well-established sexually related rights such as the right of an individual to obtain contraceptives (Griswold v Connecticut, supra), the right of a woman to terminate an unwanted pregnancy (Roe v Wade, supra; see Doe v Bolton, 410 US 179) and the right of a citizen to consume printed pornographic material in the privacy of his own home (Stanley v Georgia, 394 US 557). But the decisions in Griswold, Roe and Stanley cannot fairly be interpreted as collectively establishing an undifferentiated right to unfettered sexual expression (see Note, Constitutionality of Sodomy Statutes, 45 Fordham L Rev 553, 575). Consequently, the majority’s effort to justify its holding today as a mere extension of these decisions is, in the final analysis, entirely unconvincing.
The “fundamental” rights recognized in Griswold, Roe and their progeny are clearly not a product of a belief on the part of the Supreme Court that modern values and changing standards of morality should be incorporated wholesale into the due process clause of the Fourteenth Amendment. To the contrary, the language of the Supreme Court decisions makes clear that the rights which have so far been recognized as part of our due process guarantee are those rights to make certain familial decisions which have been considered sacrosanct and immune from governmental intrusion throughout the history of western civilization. The point has been aptly made by Justice Harlan in his oft-quoted dissent in Poe v Ullman (367 US 497, 553, quoted in Griswold v Connecticut, 381 US 479, supra, at p 499 [Goldberg, J., concurring]): “Adultery, homosexuality and the like are sexual intimacies which this State forbids * * * but the intimacy of husband and wife is necessarily an essential and accepted feature of the institution of marriage, an institution which the State not only must allow, but which always and in every age it has fostered and *499 protected. It is one thing when the State exerts its power either to forbid extra-marital sexuality * * * or to say who may marry, but it is quite another when, having acknowledged a marriage and the intimacies inherent in it, it undertakes to regulate by means of the criminal law the details of that intimacy”. Justice Douglas also made clear the nature of the “right of privacy’.’ that was being protected when he stated in Griswold v Connecticut (supra, at p 486): “We deal with a right of privacy older than the Bill of Rights — older than our political parties, older than our school system * * * It is an association that promotes a way of life”.
This is not to suggest that the Federal Constitution protects only those sexually related decisions that are made within the context of the marital relationship. As the majority notes, such a conclusion was effectively foreclosed when the Supreme Court stated in Eisenstadt v Baird (405 US 438, 453, supra): “It is true that in Griswold the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child” (emphasis in original).
Nevertheless, contrary to the position taken by the majority, I cannot agree that this language foreshadows a recognition by the Supreme Court of a generalized right to complete sexual freedom for all adults, whether married or single. Instead, as is suggested by the careful wording of the quoted paragraph, I would conclude that Eisenstadt stands only for the narrower proposition that the ancient and “fundamental” right of an individual to decide “whether to bear or beget a child” cannot be limited to married adults (accord Hindes, Morality Enforcement Through the Criminal Law and the Modern Doctrine of Substantive Due Process, 126 U of Pa L Rev 344, 361-362).[1] Under this view, *500 Eisenstadt may be regarded as a simple extension of a long line of eases protecting “freedom of personal choice in matters of marriage and family life” (Roe v Wade, 410 US 113, 169, supra [Stewart, J., concurring; emphasis supplied] ; see Loving v Virginia, 388 US 1 [personal decisions relating to marriage]; Prince v Massachusetts, 321 US 158 [decisions relating to family relationships] ; Skinner v Oklahoma, 316 US 535 [decisions relating to procreation] ; Pierce v Society of Sisters, 268 US 510; Meyer v Nebraska, 262 US 390 [decisions relating to childrearing and education]). Indeed, even the highly controversial decision in Roe v Wade (supra) holding the freedom of women to obtain abortions to be a constitutionally protected right may be regarded as part of the continuum of cases that bring within the ambit of the due process clause those familial decisions that historically have enjoyed immunity from governmental regulation. As the Roe court was careful to point out: “It perhaps is not generally appreciated that the restrictive criminal abortion laws in effect in a majority of States today are of relatively recent vintage. Those laws, generally proscribing abortion or its attempt at any time during pregnancy except when necessary to preserve the pregnant woman’s life, are not of ancient or even of common-law origin. Instead, they derive from statutory changes effected, for the most part, in the latter half of the 19th century” (410 US 113, 129, supra).
The majority impliedly recognizes that the Supreme Court has to date limited the protection of the Constitution *501 to decisions relating to the traditionally protected areas of family life, marital intimacy and procreation. Yet the majority has also concluded that there exists “no rational basis * * * for excluding from the same protection decisions * * * to seek sexual gratification from what at least once was commonly regarded as ‘deviant’ conduct” (p 488). I must disagree, however, because my reading of the recent Supreme Court cases leads me to the conclusion that the distinction repeatedly drawn in those cases between freedom of choice in the historically insulated areas of procreation, family life and marital relationships on the one hand and the general freedom of unfettered sexual choice on the other is more than just a temporary or artificial one.[2]
The assertion that the theories espoused in Griswold, Roe and their progeny may be likened to the discredited doctrine of “substantive due process” (see, e.g., Coppage v Kansas, 236 US 1; Lochner v New York, 198 US 45; Allgeyer v Louisiana, 165 US 578; see, generally, Tribe, American Constitutional Law, §§ 8-1 through 8-7) would not come as a surprise to any serious constitutional scholar. Many have made the observation that the modern notion of “fundamental rights” bears a striking resemblance to the Lochner doctrine under which State economic and social *502 regulations were routinely struck down as violative of certain basic, substantive freedoms that were thought to inhere in the due process clauses of the Fifth and Fourteenth Amendments (see, e.g., Roe v Wade, 410 US 113, 167-171 [Stewart, J., concurring], 171-178 [Rehnquist, J., dissenting], supra; Griswold v Connecticut, 381 US 479, 514-527 [Black, J., dissenting], supra; Tribe, American Constitutional Law, § 15-2; Craven, Personhood: The Right to Be Let Alone, 1976 Duke LJ 699, 712-713; Epstein, Substantive Due Process By Any Other Name: The Abortion Cases, 1973 S Ct Rev 159). The Lochner doctrine was ultimately rejected by the Supreme Court, in part because it had placed the court in the position of a “superlegislature” enabling it to use the “vague contours” of the due process clause as a vehicle for striking down State legislation which it found to be inconsistent with its own contemporary views of natural law (Ferguson v Skrupa, 372 US 726; accord Williamson v Lee Opt. Co., 348 US 483, 488; Day-Brite Light. v Missouri, 342 US 421, 423). Indeed, inherent in the Lochner doctrine was the very real danger that a countermajoritarian institution such as the court would impose upon the elected officials of State government its ad hoc notions regarding the substantive content of the term “liberty” and would place restrictions upon the States’ power to govern over and above those mandated by the specific provisions contained in the body of the Constitution and the Bill of Rights. It was out of a recognition of this danger that the rule of judicial restraint and minimal judicial scrutiny of State legislation was born (see Tribe, American Constitutional Law, § 8-7).
In the wake of Griswold and Roe, it is no longer an intellectually defensible position to suggest that the once discredited doctrine of “substantive due process” is entirely dead and buried. On the other hand, it is far from clear that those two cases heralded an unqualified return to the days when a Judge acted as “a knight-errant roaming at will in pursuit of his own ideal of beauty or of goodness” (Cardozo, Selected Writings, Nature of the Judicial Process, at p 164, quqted in People v Shepard, 50 NY2d 640, 646, supra). As the language of those decisions and their forerunners indicates, the “fundamental” rights so far recog *503 nized by the Supreme Court under the modern version of “substantive due process” have been strictly limited to those that may be traced to matters that were traditionally insulated from g’overnmental intrusion. In my view, it is precisely this limitation that differentiates the relatively recent “fundamental right” concept from the long discarded and truly pernicious doctrine enunciated in Lochner v New York (supra).
To suggest, as the majority does, that the concept of “fundamental rights” should be expanded to include a generalized right to sexual gratification in whatever form would be, in effect, to bring the law of “substantive due process” full circle by eliminating all of its present salutary limitations and restoring it to its former status as a vehicle for lawmaking by judicial fiat. The majority acknowledges in passing that the sexual,choice the defendants now assert as a matter of constitutional right was once regarded as “ ‘deviant’ conduct” (p 488), but it erroneously ascribes no legal significance to that fact, relegating it instead to an irrelevant phenomenon of theology and privately held moral beliefs. This rather glib refusal to take account of the historical treatment of consensual sodomy as criminally punishable conduct has left a gaping hole in the majority’s analysis.
In contrast to decisions relating to family life, matrimony and procreation, decisions involving pure sexual gratification have been subject to State intervention throughout the history of western civilization (see Griswold v Connecticut, 381 US 479, 505, supra [White, J., concurring]; Poe v Ullman, 367 US 497, 553, supra [Harlan, J., dissenting] ; Doe v Commonwealth’s Attorney for City of Richmond, 403 F Supp 1199, affd 425 US 901; Dawson v Vance, 329 F Supp 1320, 1322; State v Bateman, 25 Ariz App 1, 4, revd in part 113 Ariz 107 [en banc]). Scholars from Aquinas to Blackstone considered even consensual sodomy to be as heinous as the crime of rape (43 Aquinas, Summa Theologiae, pp 246-249 [Gilby ed] ; 4 Blackstone’s commentaries *215; see, generally, Richards, Unnatural Acts and the Constitutional Right to. Privacy: A Moral Theory, 45 Fordham L Rev 1281, 1292-1298). Indeed, as early as 1553 *504 during the reign of Henry VIII, England enacted statutes prohibiting sodomy which became part of the American common law at the time of the American Revolution and were later embodied in the penal codes of the various States. Thus, although some may take offense at the persistence of the proscriptions against consensual sodomy in our modern law, the fact remains that western man has never been free to pursue his own choice of sexual gratification without fear of State interference. Consequently, it simply cannot be said that such freedom is an integral part of our concept of ordered liberty as embodied in the due process clauses of the Fifth and Fourteenth Amendments.
In view of the continuous and unbroken history of anti-sodomy laws in the United States, the majority’s decision to strike down New York’s statute prohibiting consensual sodomy can only be regarded as an act of judicial legislation creating a “fundamental right” where none has heretofore existed. As such, today’s decision represents a radical departure from cases such as Griswold and Roe, in which the Supreme Court merely swept aside State laws which impaired or prohibited entirely the free exercise of rights that traditionally had been recognized in western thought as being beyond the reach of government. I cannot concur in the majority’s conclusion.[3] As Justice Black once observed, “I like my privacy as well as the next one, but I am nevertheless compelled to admit that government has a right to invade it unless prohibited by some specific consti *505 tutional provision” (Griswold v Connecticut, 381 US 479, 510, supra [Black, J., dissenting]) .[4]
Accordingly, I cast my vote to reverse the order of the Appellate Division in People v Onofre and to affirm the respective orders of the County Court in People v Peoples, People v Goss and People v Sweat.
Judges Wachtler, Fuchsberg and Meyer concur with Judge Jones; Judge Jasen concurs in result in a separate opinion; Judge Gabrielli dissents and votes to reverse in another opinion in which Chief Judge Cooke concurs.
In People v Onofre: Order affirmed.
Judges Wachtler, Fuchsberg and Meyer concur with Judge Jones; Judge Jasen concurs in result in a separate opinion; Judge Gabrielli dissents and votes to affirm in another opinion in which Chief Judge Cooke concurs.
In People v Peoples and Goss and People v Sweat: Orders reversed, convictions vacated and informations dismissed.

. I find additional support for my interpretation of the Eisenstadt opinion *500 in subsequent pronouncements by the Supreme Court. In Paris Adult Theatre 1 v Slaton (413 US 49, 68), for example, the court squarely rejected the argument that “conduct which directly involves ‘consenting adults’ only has, for that sole reason, a special claim to constitutional protection”. In response to this contention, the court observed: “Our Constitution establishes a broad range of conditions on the exercise of power by the States, but for us to say that our Constitution incorporates the proposition that conduct involving consenting adults only is always beyond state regulation, is a step we are unable to take” (footnotes omitted).
Similarly, in Roe v Wade (410 US 113,154), the Supreme Court refused to accept the contention that “the claim * * * that one has an unlimited right to do with one’s body as one pleases bears a close relationship to the right of privacy previously articulated in the Court’s decisions”. The Roe court flatly stated that “[t]he Court has refused to recognize an unlimited right of this kind in the past”.

. While the majority has placed great reliance upon the decision of the Supreme Court in Stanley v Georgia (394 US 557) as support for the proposition that the Bill of Rights encompasses a general right of privacy and personal autonomy, that decision, in my view, is not susceptible of such an expansive reading (compare Paris Adult Theatre I v Slaton, 413 US 49). In Stanley, the court struck down a State statute that penalized the private possession of printed pornographic material in the home. Although the Stanley court acknowledged that the obscene materials themselves would not ordinarily be covered by the protection of the First Amendment (see Roth v United States, 354 US 476), it made clear that its decision to invalidate the challenged legislation was based in large measure upon the individual’s First Amendment “right to receive information and ideas, regardless of their social worth” "(394 US, at p 564). Indeed, in a significant passage of its opinion, the Stanley court stated: “If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch” (id., at p 565). The so-called “privacy right” recognized in Stanley may thus be regarded as a simple extension of the First Amendment guarantee against governmental interference with the transmission of ideas. That the “privacy right” articulated in Stanley does not extend beyond the “right to receive information” and into the claimed right to receive “sensations”, whether sexually or chemically induced, was reaffirmed in our recent decision in People v Shepard (50 NY2d 640, supra).

. Without intending to sound a general alarm, I cannot help but wonder what the limits of the majority’s new doctrine of “personal autonomy” might be. If, for example, the freedom of an individual to engage in acts of consensual sodomy is truly a “fundamental right”, it would seem fairly clear that, absent a “compelling state interest”, the State cannot impose a burden upon the free exercise of that right by limiting the individual’s access to government jobs (cf. Shapiro v Thompson, 394 US 618). Moreover, if the only criterion for determing when particular conduct should be deemed to be constitutionally protected is whether the conduct affects society in a direct and tangible way, then it is difficult to perceive how a State may lawfully interfere with such consensual practices as euthanasia, marihuana smoking, prostitution and homosexual marriage. I very much regret that the majority has failed in its discussion of the “fundamental right” to personal autonomy to set forth some analytical framework for resolving difficult questions such as these.

. Inasmuch as I conclude that there is no “fundamental right” to sexual gratification, I must also consider whether section 130.38 of the Penal Law represents an irrational classification on the basis of marital status in violation of the equal protection clause of the Fourteenth Amendment. Since marital status has never been recognized as a “suspect classification” (compare Execu^ tive Law, § 296), the legislative distinction between marrieds and unmarrieds may stand if it bears some rational relation to a legitimate governmental interest.
Unlike my colleagues in the majority, I have no trouble concluding that the legislative decision to permit married individuals to engage in conduct that is forbidden to the unmarried is rationally based. While the State may prefer that none of its citizens engage in the proscribed forms of sexual gratification, it may properly limit its statutory prohibition to those that are unmarried oh the theory that the institution of marriage is so important to our society that even offensive intimacies between married individuals should be tolerated. The statute at issue in this case is thus distinguishable from the statute at issue in Eisenstadt v Baird (405 US 438), where the Supreme Court concluded that a ban on the sale of contraceptives to unmarrieds only had no relation to any legitimate government interest.