Fuchsberg, J.
(concurring). The court here confronts a classical due process attack on the constitutionality of legislation in the economic sphere. This century has witnessed a legal metamorphosis in this area of the law. The product of the change is what for some decades now may be fairly described as virtually a “hands-off” approach by the United States Supreme Court. In contrast, to fill this gap in an age when governmental legislative and quasi-legislative intervention in economic affairs abounds, courts in most States, relying on their own Constitutions, have reasserted a right, albeit somewhat limited, to scrutinize and, where appropriate, invalidate offending regulation.
Specifically, a series of rulings by this court similarly separated New York from the Federal abstention. Never articulated in perspective, the totality of our adjudications nevertheless unmistakably reveals the pattern of principles which control this case. It seems to me that the time has come to more fully acknowledge the history and rationale on which this decisional line rests. Because I so believe, rather than join in the cursory memorandum in which the court disposes of this case, I set out the fuller basis on which I prefer to ground my own vote.
It is on this basis that we are called upon to say whether a local law which interdicts “[t]he installation and use of coin operated, self-service or customer-operated dispensing pumps at gasoline service stations or automobile service *750 stations” meets the constitutional due process mandate of rationality.[1] The question takes on increased practical importance in light of the undisputed proof that, in the four years preceding 1978, when this controversy first entered our courts, the self-service method of retailing gasoline has increased its share of that national market from 6.2% to 45%.
This issue arrives in two cases, one by the Town of North Hempstead against Exxon Corporation and the other by Mobil Oil Corporation against the town.[2] In the Exxon suit, the town seeks to enjoin the corporation from operating a partial self-service station, some of whose pumps are to be operated by customers and others by an attendant. Exxon counterclaims for a judgment declaring the ordinance unconstitutional and enjoining the town from enforcing it. In the Mobil action, that corporation seeks similar relief as to a full self-service station, premising its constitutional claim on both the State and Federal Constitutions.
The ensuing joint non jury trial explored the potential for fire hazards in self-service gasoline stations as compared to full-service stations. In the course of an extensive presentation, Exxon and Mobil, insisting that existing safety devices, governmental regulations and a recommended industry code would effectively safeguard the public against dangers peculiar to customer operation, pointed, among other things, to section 3.6 (d) of the Nassau County Fire Prevention Ordinance and a.code recommended for self-service stations by the privately structured National Fire Protection Association. These would require instruction for the attendants who control the central console panels which compute the amount and price of the gasoline which flows each time a self-service pump is activated and would command the means of shutting off the power on which *751 the dispensing units run. These standards would also mandate an auditory intercommunication system between console attendant and dispensing area and prohibit latch-open devices on nozzles, thus preventing operation without constant manual pressure on the trigger. It is not disputed that respondents intended to comply with these criteria in good faith.
The respondents also offered statistics which purportedly proved that in Nassau County during 1975-1977, the years immediately preceding the trial, no service station fires were cataloged as attributable to the fact that patrons serviced themselves and that the American Petroleum Institute, a leading oil company spokesman, reported that, out of a total of 53 service station fires in the United States in 1977, those occurring at self-service stations numbered only two, neither of which related to the method of dispensing gasoline.
For its part, the town attacked the reliability of both the safety devices and the statistics. For that purpose, it offered testimony by an owner of a partial self-service station that, in his experience, gasoline spills and other departures from safe practice occur far more frequently when customers do the dispensing. It also asserted that, since the vaunted cutoff devices are not automatic, but dependent on the alertness of a single operator preoccupied with multiple pumps and other responsibilities, the security it provides is not comparable to that afforded when a practiced employee handles a pump directly.[3] As to the statistics, the town argued that those provided by the National Fire Protection Association and American Petroleum Institute are incomplete, being restricted to fires which resulted in property damage of over $1,000, and that, in any event, the accuracy of the statistics-gathering procedure was flawed *752 by the limited reliability of what are essentially voluntary reporting sources. To illustrate these contentions, it adduced evidence that, while the institute received only 53 reports of fires in gasoline stations in all of the United States in 1977, the Nassau County Fire Marshall’s office, which mandates compulsory reporting of all fires, received 11 reports in that single one of the many hundreds of counties in the country.[4]
After hearing both sides, Special Term came to the conclusion that the respondents failed to establish the unconstitutionality of the town ordinance. But, the Appellate Division, Second Department, in turn, reversed on the rationale that, while the town’s position was “compelling as an abstract concept”, it had to “give way to contrary .empirical proof”. Given this factual and procedural background, my analysis proceeds as follows:
I start with a few comments on the genesis and development of the rational basis test against which the constitutionality of the ordinance here must be evaluated. Generally speaking, that test, as this court has articulated it in recent years, requires no more than that every enactment under the police power bear a “ ‘fair, just and reasonable connection’ between it and the promotion of the health, comfort, safety and welfare of society” (Montgomery v Daniels, 38 NY2d 41, 54). It is basic too that, in ascertaining whether a statute has met this test, there is an exceedingly strong presumption of constitutionality which, while rebuttable, can be overcome only by a demonstration that it is unconstitutional beyond a reasonable doubt (Town of Huntington v Park Shore Country Day Camp at Dix Hills, 47 NY2d 61, 65; Lighthouse Shores v Town of I slip, 41 NY2d 7,11).[5]
*753 These rules could not always have been stated with such confidence. Before West Coast Hotel Co. v Parrish (300 US 379 [1937]) heralded departure from the Supreme Court’s former concern for economic substantive due process, that court would subject legislation affecting property to a close assessment not only of means but of goals, whose constitutional legitimacy it would eye with a court-conceived and value-laden judgment (see Tribe, American Constitutional Law, § 8-4, p 438; Gunther, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv L Rev 1, 35, 42).
No list of illustrative cases would be complete without Allgeyer v Louisiana (165 US 578 [1897]), in which the court first held a State statute was violative of the due process clause of the Fourteenth Amendment because it infringed upon the liberty to contract; Lochner v New York (198 US 45 [1905]), in which the court, finding health considerations insufficient to overcome a similar application of the Fourteenth Amendment, struck down a statute limiting bakery employees’ work week to 60 hours; and Coppage v Kansas (236 US 1 [1915]), where a statute which prohibited “yellow dog” contracts, under which employees, as a condition to their continued employment, undertook to refrain from joining a union, was found to have run afoul of the Fourteenth Amendment (see, also, Adair v United States, 208 US 161).
In arriving at these decisions, the court scrutinized not only the means by which a Legislature contemplated achieving its goal, but, in terms of its own sense of the general welfare, similarly scrutinized the goal itself. Where either did not comport with its conceptions, down would go the legislation, in the name of personal liberty and property rights.
The scope of the rational basis test perhaps can best be appreciated against this background. For, in contrast to the substantive due process which prevailed when active judicial oversight of statutes affecting social and economic concerns was the order of the day (Morehead v New York ex rel. Tipaldo, 298 US 587, 633), the new test respected *754 the positive role of legislation in the achievement of these goals (Day-Brite Light. v Missouri, 342 US 421).[6]
To that end, our courts presumed that the Legislature had investigated and found a need for a particular statute (Matter of Van Berkel v Power, 16 NY2d 37, 40). So, it is now old law that it is entirely proper for a Legislature to anticipate a danger and to provide against it before it materializes (City of Rochester v West, 164 NY 510, 514; Town of Hempstead v Goldblatt, 19 Misc 2d 176, 183 [Pittoni, J.], affd 9 AD2d 941, affd 9 NY2d 101). And, under such formulations, specific legislative findings as to need were not required, for, if any state of facts, known or hypothesized, could justify the law, the court’s power of inquiry ended (United States v Carolene Prods. Co., 304 US 144, 151, supra; see Williamson v Lee Opt. Co., 348 US 483). Nor did it matter that the courts thought a statute unwise, or that its purpose could better be achieved another way, or that in practice the method chosen turned out to be ineffective (Town of Huntington v Park Shore Country Day Camp of Dix Hills, 47 NY2d 61, 65, supra). The underlying rule that evolved was that so long as a statute was neither arbitrary nor irrational, it was constitutional.
Now, this judicial deference to the legislative judgment has not been without its critics, who have deplored what they took to be an overreaction substituting a well-nigh “all-out tolerance” of economic regulation for the “inflexible negativism” characterizing the days of Lochner (see McCloskey, Economic Due Process and the Supreme Court, An Exhumation and Reburial, 1962 Sup Ct Rev 34; Struve, Less Restrictive-Alternative Principle and Economic Due Process, 80 Harv L Rev 1463; Gunther, A Model for a Newer Equal Protection, 86 Harv L Rev 1, 8). But, though the rational basis test may not be very demanding, it does define limits, and, as I have stated at the outset, most of our State courts, applying their own constitutional *755 provisions on the order of due process and equal protection,[7] have not hesitated to reassert a right to thereby scrutinize and, where appropriate, invalidate economic legislation (see Carpenter, Our Constitutional Heritage: Economic Due Process and the State Courts, 45 ABA Journal 1027; Paulsen, Persistence of Substantive Due Process in the States, 34 Minn L Rev 91).
As observed above, New York cases go the same way. Thus, in Defiance Milk Prods. Co. v Du Mond (309 NY 537 [Desmond, J.]), this court invalidated an ordinance which required that condensed or evaporated skim milk be sold only in 10 pound containers; we reasoned that this minimum weight requirement effectively interdicted retail sales for household use. Also, not too long afterwards, in Trio Distr. Corp. v City of Albany (2 NY2d 690), we held irrational a municipal law prescribing that retail ice cream trucks each carry two attendants to enhance the safety of children drawn to its wares; on balance, we held the mandated method of implementing the safety goal at once too prohibitively expensive and too dubiously related to the goal it was intended to serve.
On a related rationale, in People v Bunis (9 NY2d 1), we struck down as unconstitutional a statute, which, in order to proscribe illicit traffic in magazines “returned” for credit, indiscriminately criminalized the sale of any magazine without a cover; these means we held too broad-sweeping. So too, more recently, in People v Scott (26 NY2d 286), focusing again on means, we indicated that a local town law, which forbade the storage of disabled motor vehicles on any open land, was entirely too broad to be justified by purely aesthetic concerns (see, also, People ex rel. Pinello v Leadbitter, 301 NY 695 [ordinance regulating hours for barbers] ; McKay, Constitutional Law, Economic Rights, 31 NYU L Rev 1358, 1367).
The common thread connecting all these cases is that, *756 while, in each, the objective of the statute at stake was within the legislative power of the State, the means adopted were not reasonably calculated to achieve that objective. In so deciding, we left no doubt that a court should not eschew all concern over the relationship between the means a Legislature adopts and the end to which the means are directed.[8] Indeed, examination of the means helps guarantee that opposing views have been aired. (See Comment, Counterrevolution in State Constitutional Law, 15 Stan L Rev 309; Note, 53 Col L Rev 827.)
Turning now to the ordinance before us,[9] I at once note the unassailable propositions that gasoline is a highly flammable and explosive substance the dispensing of which is potentially dangerous, and that its regulation serves an important public purpose (People v Faxlanger, 1 AD2d 92, 94, affd 1 NY2d 393). Further, in enacting it, the town acted pursuant to express grants of legislative power to prevent fire and to promote the health and safety of the community (Town Law, § 130, subds 5, 15). The question remains, however, whether the town’s prohibition of self-service stations rationally serves to further the goal of fire prevention.
In attempting to demonstrate beyond a reasonable doubt the ordinance’s unconstitutionality (see Lighthouse Shores v Town of I slip, 41 NY2d 7, 11, supra), in essence the respondents reassert the statistics bearing on the effectiveness of the safety measures to which I referred earlier. Assuming that when the town evaluated its need for the ordinance, it had before it all the information adduced at trial, one cannot say it was not free to reach a conclusion opposite to the one which the respondents insist is the only permissible one. *757 Specifically, the town board had the right, if it was so persuaded, to place less reliance on the safeguards which the respondents emphasized. The qualitative or quantitative weight it thought should be accorded facts and arguments brought to its attention or otherwise within its ken was its prerogative. It would have been rational, for instance, for its members to arrive at an opinion that the potential for added danger each self-service pump presented — for instance, engines left running; cigarettes left lit; unapproved containers filled; inexperienced and unqualified persons, including children, causing spillage — would not be allayed by a console attendant charged with the remote control of multiple pumps. Nor was it beyond the permissible range of its legislative judgment to decide that, in any event, the gasoline would be more safely dispensed directly by regular attendants. All these are not abstract considerations. They have been among those related to us by the board.
I recognize, of course, that a competing viewpoint was not only entertainable, but, in the eyes of the respondents, and of others, no doubt was far preferable. But the choice among permissible alternatives was that of the board, not of the respondents and not of the court. Beyond that, it goes without saying, there is resort to the ballot by which board members are re-elected. Essentially, in the end, all we may decide here is whether, in passing the ordinance, the board acted “without rhyme or reason” (Defiance Milk Prods. Co. v Du Mond, 309 NY 537, 541, supra). Under the circumstances, I cannot say it did.
Finally, I observe that this ordinance does not suffer from the flaws of economic legislation the court has had occasion to declare unconstitutional in the past. It is neither a regulation which functions as a prohibition, nor a prohibition which is'so excessive that it interdicts otherwise legitimate activity, the situations in the cited New York cases. The regulation of the method of the sale of gasoline bans self-service, but the sale of gasoline by the full-service method is permitted. While enforcement may result in some economic disadvantage for the respondents, the individual interest must bow to that of the general public (see, generally, Noble State Bank v Haskell, 219 US 104, 111 [Holmes, J.]). This is especially true where the law’s *758 purpose is to protect against a perceived danger to public safety.
It is for these reasons that the order of the Appellate Division should be reversed and the judgment in each case reinstated.
Chief Judge Cooke and Judges Gabrielli, Jones, Wachtler and Meyer concur in memorandum; Judge Fuchsberg concurs in a concurring opinion in which Judge Jasen concurs.
Order reversed, etc.

. The local law at stake was enacted pursuant to the power delegated by subdivision 5 of section 130 of the Town Law which, under the title “Fire Prevention” provides for the regulation of “the use, sale, storage and transportation of * * * inflammables”.

. The actions were consolidated for trial. Though separate judgments are entered, the cases then went to the Appellate Division on a single record and there were argued jointly. The present appeal is from the Appellate Division’s single order disposing of both appeals.

. To indicate universal recognition of this peril, the town also draws attention to the following provision of National Fire Protection Association Code: “7644. It shall he the responsibility of the attendant to (1) prevent the dispensing of Class I liquids into portable containers not in compliance with 7620; (2) to control sources of ignition; and (3) immediately handle spills and fire extinguishers, if needed. Attendant or supervisor on duty shall be mentally and physically capable of performing the functions and assuming the responsibilities prescribed in this section.”

. According to the World Almanac and Book of Facts (1980 ed), there are a total of 3,044 counties in the 50 States of the Nation.

. This is to be distinguished from cases challenging legislation which may impinge on a particular prohibition of the Constitution, as found, perhaps most dramatically, in the First Amendment, where the presumption at best would have limited force. In contrast, where the more general language of the
Fourteenth Amendment stands alone, there may be well-nigh unrestricted play of the political process in the regulation it authorizes (United States v Carolene Prods. Co., 304 US 144, 152, n 4).

. For discussion of the factors influencing the Supreme Court’s abandonment of economic substantive due process, see Murphy, Constitution in Crisis Times (70-82, 99-110), and Sutherland, Constitutionalism in America (481-501).

. A State court decision determining the validity oí a statute as a matter of State constitutional law involves no Federal question and therefore may not be reviewed by the Supreme Court, so long as the decision of the State court does not contravene some provision of Federal law.

. In arriving at this result, unlike courts in some States, which more discretely relied on their own Constitutions alone, our court, in the main, discussed the subject in terms of due process generally. This does not detract from the point, all the more so since the parties in all these cases, save one, raised the issue under both the Federal and New York Constitutions. In the exception, People v Scott (26 NY2d 286, supra), solely the State constitutional due process ground was in issue.

. While it was enacted by a local town board, the ordinance is to be measured by the same standards as a statute passed by the State Legislature (see Dutchess Sanitation Serv. v Town of Plattekill, 51 NY2d 670, 676, n 2; Lighthouse Shores v Town of Islip, 41 NY2d 7, 11, supra).